UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| ALEXANDER ARBUCKLE and JAVIER SORIANO, | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| -v- | **Index No.  14-cv-10248 (ER)** |
| THE CITY OF NEW YORK; NEW YORK CITY POLICE DEPARTMENT ("NYPD") CHIEF OF PATROL JAMES P. HALL; NYPD DEPUTY COMMISSIONER OF LEGAL MATTERS ("DCLM") OFFICER KEVIN O'DONNELL; NYPD CAPTAIN WILLIAM TAYLOR; NYPD SERGEANT RICKIE KNAPP; NYPD SERGEANT SALVATORE FERRO, SHIELD NO. 02819, NYPD OFFICER ELISHEBA VERA, SHIELD NO. 25318; NYPD OFFICER FREDDY YNOA, SHIELD NO. 18851; and NYPD OFFICER DENISE PITRE, SHIELD NO. 14589, | **ECF CASE** |
| Defendants. | |

---

Plaintiffs, ALEXANDER ARBUCKLE and JAVIER SORIANO, by their counsel, GIDEON ORION OLIVER, as and for their First Amended Complaint against Defendants, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of their civil rights, as secured by said statutes and the Constitution of the United States and the Constitution and laws of the State of New York.

2.      On January 1, 2012, Plaintiffs participated in or were nearby peaceful activities protected by the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution associated with Occupy Wall Street ("OWS") – a political

movement dedicated to addressing interconnected grievances of the 99% *vis a vis* the 1%, including income inequality - in the vicinity of 13th Street and 5th Avenue in New York County.

3.      At that location, at around 2:30AM on January 1, 2012, without lawful authority or justification, and acting pursuant to unlawful policies, practices, and customs complained of elsewhere herein, Defendants unlawfully arrested Plaintiffs, detained Plaintiffs for an excessive period of time, maliciously abused process against, and otherwise injured Plaintiffs.

4.      Defendants Vera and Pitre, and possibly other defendants, subsequently provided false information to prosecutors, and made false written statements in arrest processing and criminal prosecution documents including criminal court complaints sworn to under oath, and Defendant Vera falsely testified under oath during a criminal trial in connection with Plaintiff Arbuckle's arrest and prosecution.

5.      Other federal civil rights cases arising from the mass arrests made by Defendants and other NYPD agents at approximately the same time, place, and location and raising substantially similar policy, practice, and custom-related claims include, but may not be limited to, *Damian Treffs v. City of New York, et al.*, 12-cv-3030 (HB)(KNF), and *Jennifer Peat, et al. v. City of New York, et al.*, 12-cv-8230 (SAS)(HP). Both cases were resolved by settlement.

6.      To the extent they support Plaintiffs' *Monell* claims, or any other claims raised by Plaintiffs herein, the allegations from the most recently amended complaints in each of the *Treffs* and *Peat* matters, are specifically incorporated by reference herein.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

8.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant

2

to 28 U.S.C. §§ 1331, 1343(a)(3-4).

9.     Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claims arose in the Southern District of New York.

## PARTIES

10.     Plaintiff ALEXANDER ARBUCKLE is a Caucasian male, and at all times relevant to this action was a resident of New York State.

11.     Plaintiff JAVIER SORIANO is an Indigenous male, and at all times relevant to this action was a resident of New York State.

12.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

13.     Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and Defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

14.     At all times relevant herein, Defendant  NYPD CHIEF OF PATROL JAMES P. HALL was the NYPD's Chief of Patrol; Defendant NYPD DEPUTY COMMISSIONER OF LEGAL MATTERS ("DCLM") OFFICER KEVIN O'DONNELL was a NYPD agent for the NYPD's DCLM; Defendant WILLIAM TAYLOR was a NYPD Captain; Defendants NYPD SERGEANT RICKIE KNAPP and NYPD SERGEANT SALVATORE FERRO were both NYPD Sergeants; and these aforementioned Defendants (collectively, the "Supervisory Defendants") were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving Plaintiffs of their rights and/or in developing and/or

implementing the unconstitutional policies, practices, customs and/or conduct complained of herein. They are each being sued herein in their individual and official capacities.

15.     Defendants were personally involved in designing and/or implementing the policies and practices complained of herein, and were personally involved in or responsible for directing, supervising, and/or assisting in Plaintiffs' arrests and/or arrest processing and/or failed to intervene to prevent injuries to Plaintiffs.

16.     At all times relevant herein, Defendants NYPD OFFICER ELISHEBA VERA, SHIELD NO. 25318; NYPD OFFICER FREDDY YNOA, SHIELD NO. 18851; and NYPD OFFICER DENISE PITRE, SHIELD NO. 14589 were officers, employees, and agents of the NYPD and who were personally involved in depriving Plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below. They are each being sued herein in their individual and official capacities.

17.     At all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

18.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting within the scope of their employment by the Defendant City.

19.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by the Defendant City.

20.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned,

acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

21.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

22.     Each individual Defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

23.     On December 31, 2011, Plaintiffs were acting as photojournalists documenting an OWS celebration in Zuccotti Park and police response thereto.

24.     Plaintiffs were both acting as photojournalists intending to document newsworthy protest activity and police response thereto in a public place for potential broadcast and dissemination.

25.     On the stretch of 13th Street between Sixth Avenue and Fifth Avenue, both Plaintiffs were acting as photojournalists by taking photographs and/or video.

26.     After midnight, on January 1, 2012, some OWS demonstrators began to leave the park in groups.

27.     Between around 12:30AM and 2:30AM, Plaintiffs followed those OWS demonstrators for several miles, documenting their march from lower Manhattan to the East Village.

28.     Between around 12:30AM and 2:30AM, NYPD officers, including some or all of the Defendants, accompanied the demonstrators.

29.     Between around 12:30AM and 2:30AM, NYPD officers, including some or all of the Defendants, directed and facilitated the demonstration.

30. At approximately 2:30AM on January 1, 2012, in the vicinity of 13th Street and 5th Avenue, Plaintiffs were each detained and arrested by NYPD officers, including the Defendants.

31. At that time, place, and location, prior to their arrests, Plaintiffs had not been engaged in unlawful conduct.

32. Rather, Plaintiffs had been engaged in constitutionally protected conduct, to wit, standing by and observing protest activity and police response thereto and acting as photojournalists observing and documenting the OWS demonstration and police response thereto.

33. Specifically, Plaintiff Arbuckle was walking on the sidewalk on 13th Street heading east toward Fifth Avenue, when a line of police scooters accelerated past him and blocked off the intersection of 13th Street and Fifth Avenue.

34. Police gave no orders to disperse at all prior to forming the line of scooters.

35. The line of scooters cut off and trapped Plaintiff Arbuckle, Plaintiff Soriano, and everyone else on the street.

36. As Mr. Arbuckle approached the line of scooters, a police officer shouted at him, "Up against the wall!"

37. Mr. Arbuckle was subsequently placed in plastic flexcuffs and placed in an NYPD prisoner transport vehicle.

38. Similarly, Plaintiff Soriano was walking on the sidewalk on 13th Street when a line of police scooters blocked off the intersection of 13th Street and Fifth Avenue.

39. Plaintiff Soriano had not been part of any "group" blocking vehicular or pedestrian traffic on 13th Street.

40.     Without warning, Plaintiff Soriano was approached from behind by unidentified NYPD officers, and Defendant O'Donnell.

41.     Defendant O'Donnell and two other NYPD officers physically detained Plaintiff Soriano up against a wall.

42.     Defendant O' Donnell asked another one of the Supervisory Defendants in sum and substance whether Mr. Soriano was under arrest.

43.     Mr. Soriano explained to Defendant O'Donnell and at least another Supervisory Defendant that he was a photojournalist, not a protester.

44.     Upon information and belief, the Supervisory Defendant directed Defendant O'Donnell that Plaintiff Soriano was under arrest.

45.     Rather than releasing Plaintiff Soriano, Defendant O'Donnell surrendered Plaintiff. Soriano to other NYPD officers for mass arrest processing.

46.     Plaintiffs were subsequently transported to a NYPD facility for mass arrest processing.

47.     On December 31, 2011 and January 1, 2012, Defendant Hall was the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests.

48.     Upon information and belief, on December 31, 2011 and January 1, 2012, Defendant Hall was the NYPD Incident Commander in the vicinity of Plaintiffs' arrests and was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

49.     Upon information and belief, according to NYPD policy and procedure, as Incident Commander, Defendant Hall and others among the Supervisory Defendants had the responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge

of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was effected.

50.     Upon information and belief, of the Supervisory Defendants had been personally involved in other mass arrests related to OWS prior to and on the date of the incident, including by supervising mass arrests and mass arrest processing related to OWS.

51.     On December 31, 2011 and January 1, 2012, Defendant Hall and others among the Supervisory Defendants knew or should have known that the NYPD's crowd control plans with respect to the planned protest activities would result in unlawful mass arrests, uses of force, excessive detentions, and other injuries to Plaintiffs and others.

52.     Defendant Hall and others among the Supervisory Defendants knew or should have known that their crowd control tactics would result in purported dispersal orders that were either not dispersal orders under the law, not lawful, and/or impossible to comply with, as well as mass arrests without appropriate individualized determinations of probable cause.

53.     The Supervisory Defendants suggested, endorsed, ratified, or enacted a policy, practice, or procedure on December 31, 2011 and January 1, 2012 of not issuing summonses for Disorderly Conduct and other summons-eligible offenses in connection with OWS-associated protests.

54.     The Supervisory Defendants suggested, endorsed, ratified, or enacted a policy, practice, or procedure on December 31, 2011 and January 1, 2012, of having assigned arresting officers speak with NYPD Legal Bureau and/or CJB officers as part of the mass arrest processing procedures.

55.     The Defendants knew or should have known that processing the anticipated mass arrests as DAT's at a Mass Arrest Processing Center ("MAPC") would unnecessarily increase their arrest to release time.

56.     Upon information and belief, the average time from arrest to release on a summons in Manhattan is around two hours.

57.     In Plaintiffs' cases, their arrest to release time was hours longer than that of others similarly situated.

58.     Upon information and belief, Defendant Hall others among the Supervisory Defendants enacted the No-Summons policy, and the other mass arrest-related policies and practices complained of herein, in order to keep persons detained in connection with protest activities for excessive periods of time as compared to others detained for summons-eligible offenses and issued summonses.

59.     Defendant Hall and others among the Supervisory Defendants knew or should have known that the NYPD's December 31, 2011 and January 1, 2012 mass arrest processing plans would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations.

60.      At all relevant times herein on December 31, 2011 and January 1, 2012 at around 2:30AM, the Supervisory Defendants were each and all high-raking supervisor and policymaking officials on the scene who were actually responsible for making command and control decisions as well as supervisory decisions with respect to subordinate and other fellow officers on the scene.

61.     At all relevant times herein on December 31, 2011 and January 1, 2012,
Defendants Vera, Ynoa, and Pitre were all NYPD Officers under the command and supervision
of the Supervisory Defendants.

62.     At all times relevant herein on December 31, 2011 and January 1, 2012, all other
Defendants were under Defendant Hall in the chain of command.

63.     At all relevant times herein on December 31, 2011 and January 1, 2012,
Defendant Hall actually directed and/or supervised Defendants the other Supervisory
Defendants' activities with respect to giving police orders and instructions and/or directing,
supervising, or assisting in arrests or arrest processing, including Plaintiffs'.

64.     The NYPD chain of command works such that when Defendant Hall gives an
order on the scene of an incident all of the other officers present who receive that order are
supposed to comply with the order.

65.     Upon information and belief, on the morning of January 1, 2012, defendants Hall
and/or other Supervisory Defendants made the determination to engage in mass arrests, and
communicated that determination to subordinates, including verbally in person and/or over the
radio and/or over other NYPD communications mechanisms.

66.     At some time around or after 2:30AM on January 1, 2014, the Supervisory
Defendants directed and/or supervised the other Defendants, and other NYPD officers, with
respect to effecting Plaintiffs' arrests and/or processing Plaintiffs' arrests.

67.     When Defendants Hall, Taylor, and other Supervisory Defendants gave or caused
to be given police orders related to the incident and/or directed and/or supervised and/or
otherwise participated in Plaintiffs' arrests, Defendants did not have probable cause to believe
that any Plaintiff had committed Disorderly Conduct or any other offense.

10

68.     No police officer gave Plaintiff Soriano any dispersal order on January 1, 2012 prior to his arrest.

69.     No police officer gave Plaintiff Soriano any dispersal order on 13th Street prior to his arrest.

70.     No police officer gave any "crowd" perceived to be associated with either plaintiff any dispersal order on 13th Street prior to their arrests.

71.     No police officer gave Plaintiff Soriano any dispersal order on January 1, 2012 prior to his arrest.

72.     No police officer gave Plaintiff Arbuckle any dispersal order on 13th Street prior to his arrest.

73.     Plaintiff Arbuckle did not block vehicular or pedestrian traffic on 13th Street prior to his arrest.

74.     Plaintiff Soriano did not block vehicular or pedestrian traffic on 13th Street prior to his arrest.

75.     No witness at Plaintiff Arbuckle's criminal trial testified that any dispersal orders were given to Plaintiff Arbuckle or Plaintiff Soriano or the "crowd" they were perceived to be associated with.

76.     Defendant Vera was assigned to process, and did process, Mr. Arbuckle's arrest.

77.     Defendant Pitre was assigned to process, and did process, Mr. Soriano's arrest.

78.     Defendants Vera and Pitre were assigned to process, and did process, other arrests that morning.

79.     As part of Defendants' mass arrest processing duties, several Polaroid photographs of Defendants Vera and Pitre and Plaintiffs and/or other arrestees were taken by fellow NYPD officers.

80.     Upon information and belief, at all times relevant herein on January 1, 2012, the Supervisory Defendants were NYPD supervisors whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of the other Defendants' arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

81.     Upon information and belief, as part of Defendant Vera's and Defendant Pitre's mass arrest processing duties, they each met with either Defendant O'Donnell or another supervisor from the NYPD's Legal Bureau.

82.     Upon information and belief, as part of Defendant Vera's and Defendant Pitre's mass arrest processing duties, they met with a supervisor from the NYPD's Criminal Justice Bureau.

83.     Upon information and belief, after those meetings, and as a result of those meetings, Defendants Vera and Pitre filled out NYPD paperwork related to Plaintiffs' arrests containing false information supplied by other NYPD officers.

84.     As part of Defendant Vera's mass arrest processing duties, Defendant Vera filled out NYPD paperwork regarding Mr. Arbuckle's arrest.

85.     As part of Defendant Vera's mass arrest processing duties, Defendant Vera filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on December 31, 2011 – January 1, 2012.

86.     In NYPD paperwork, Defendant Vera identified Defendant Ynoa has having assisted in Mr. Arbuckle's arrest.

87.     In NYPD paperwork, Defendant Vera identified Defendant Pitre has having assisted in Mr. Arbuckle's arrest processing.

88.     In NYPD paperwork and in a sworn statement, Defendant Vera identified Defendant Ferro as a supervisor on the scene and a witness to the circumstances leading up to Mr. Arbuckle's arrest, and as the person who gave an allegedly lawful order to disperse.

89.     Upon information and belief, Defendant Vera met with defendant Knapp prior to filling out her NYPD arrest processing paperwork.

90.     Defendant Vera included false information in Defendant Vera's official NYPD arrest processing paperwork.

91.     For example, Defendant Vera stated in the "DETAILS" section of an arrest report: "AT TPO AO DID OBSERVE DEF ON PUBLIC SIDEWALK CAUSING DISRUPTION WITH 2 OTHERS OBSTRUCTING PEDESTRIAN AND VEHICULAR TRAFFIC. AO ORDERED TO DISPERSE DEFT REFUSED AND REAINED AT LOCATION CAUSING TRAFFIC JAM." Defendant Vera also wrote: "Deft's actions caused others in area to leave."

92.     As was later shown at trial, the only one of those statements that was perhaps true was the statement that Defendant Vera observed Plaintiff Arbuckle on a public sidewalk.

93.     As part of Defendant Pitre's mass arrest processing duties, Defendant Pitre filled out NYPD paperwork regarding Mr. Soriano's arrest.

94.     As part of Defendant Pitre's mass arrest processing duties, Defendant Pitre filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on December 31, 2011 – January 1, 2012.

95.     Upon information and belief, Defendant Pitre's arrest processing paperwork contained factual statements regarding the conduct she allegedly observed Plaintiff Soriano engage in that were not truthful.

96.     Defendant Vera's NYPD paperwork identified Defendant Knapp as a supervisor who directed and assisted Defendant Vera in arrest processing and who had a duty to verify the accuracy of and to sign off on Defendant Vera's arrest processing paperwork.

97.      Defendant Pitre's NYPD paperwork identified Defendant Knapp as a supervisor who directed and assisted Defendant Vera in arrest processing and who had a duty to verify the accuracy of and to sign off on Defendant Vera's arrest processing paperwork.

98.     In NYPD paperwork and in a sworn statement, Defendant Pitre identified Defendant Taylor as a supervisor on the scene and a witness to the circumstances leading up to Mr. Soriano's arrest, and as the person who gave an allegedly lawful order to disperse.

99.     After approximately seven hours each in police custody, each Plaintiff was eventually released with a Desk Appearance Ticket ("DAT").

100.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants provided false and misleading information to DANY.

101.    For example, in sworn accusatory instruments, Defendants Vera and Pitre made false written statements.

102.    Some of the false written statements Defendant Vera made were directly refuted by Defendant Vera's subsequent trial testimony.

103.     Upon information and belief, Defendant Vera told DANY that she had observed Plaintiff Arbuckle "and approximately 15 other protesters leave [the] sidewalk and stand in the street, chanting, holding banners and signs" and that "cars [could not] pass due to protesters in the street" and that her "S[er]g[ean]t tells [the] group to go back on the sidewalk" and then Plaintiff Arbuckle "and others stay in the street."

104.     Those statements to DANY were flatly contradicted by Defendant Vera's later trial testimony and the other evidence presented at trial, including Plaintiffs' testimony and video evidence.

105.     Defendant Vera falsely swore in an accusatory instrument that she "observed" Plaintiff Arbuckle and around 16 other people "walk from the sidewalk onto the street at the above location and stand in the lane of travel of said street" while "not in a crosswalk" and that as a result "multiple vehicles were unable to traverse said street and stopped due to the presence of defendant, separately-charged defendant, and said individuals in the street in the lane of travel."

106.     Defendant Vera also falsely swore in an accusatory instrument that she "observed [defendant] Ferro . . . instruct the defendant . . . and said individuals, to move back on the sidewalk" and that she observed them all "not return to the sidewalk following the Sergeant's instruction and instead remain[] in the roadway blocking vehicular traffic."

107.     Those sworn statements were flatly contradicted by Defendant Vera's later trial testimony and the other evidence presented at trial, including Plaintiffs' testimony and video evidence.

108.     Based on the accusatory instrument falsely sworn by Defendant Vera, Mr. Arbuckle was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct).

109.     Based on the accusatory instrument falsely sworn by Defendant Pitre, Mr. Soriano was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct).

110.     Defendant Pitre falsely swore in an accusatory instrument that she "observed" Mr. Soriano "and numerous others chanting and walking in the street and sidewalk" and that she then observed Defendant Taylor "instruct the defendant and others, in substance, to stay on the sidewalk and keep moving" and that she "observed [Mr. Soriano] walk on to the street and into a lane of vehicular traffic multiple times despite Captain Taylor's instructions."

111.     Upon information and belief, Defendant Pitre did not observe those things happen and they did not happen.

112.     Additionally, the "orders" described in the accusatory instrument, which was based on Defendant Pitre's lies, were not lawful orders to disperse, and could not have been considered such by any reasonably trained police officer.

113.     As a matter of New York Law, an order or orders "to stay on the sidewalk and keep moving" are not orders disperse.

114.     After at least two court appearances, Mr. Arbuckle's case went to trial.

115.     Immediately prior to trial, the 240.20(6) (Disorderly Conduct – Failure to Comply with a Lawful Dispersal Order) charge was dismissed on the motion of the prosecutor.

116.     Upon information and belief, the prosecutor moved to dismiss the 240.20(6) charge because there was no proof whatsoever that Plaintiff Arbuckle had violated a lawful dispersal order.

117.     After a two-day trial on May 14, 2012 and May 15, 2012 at which both Plainitff Arbuckle and Plaintiff Soriano testified, Mr. Arbuckle was acquitted of the sole 240.20(5) charge.

118.     At the trial, defendant Vera testified that his assignment was to follow on foot a "large crowd" of "maybe 25 to 50" people she characterized as "protesters" walking on the sidewalks who were also being followed by police vehicles including vans and scooters in the street.

119.     Defendant Vera testified that she and other NYPD officers were walking in the street as the "group" of people they perceived to be "protesters" were walking on the sidewalk for around forty minutes.

120.     Between Sixth and Fifth Avenues, Defendant Vera testified, Defendant Vera accelerated eastbound on 13th Street and got ahead of the "group."

121.     Defendant Vera testified that she then "observed Mr. Arbuckle and a group of approximately 15 other people in the street blocking vehicular traffic."

122.     Defendant Vera testified that was the first time she observed Mr. Arbuckle, when he was "on 13th Street coming from Sixth Avenue to Fifth Avenue in the middle of the street, blocking vehicular traffic" and that he was "in the middle of" 15 people arranged into "three rows."

123.     Defendant Vera testified that she made that observation at around one minute before Plaintiff Arbuckle was arrested at 2:36 AM.

124.     Defendant Vera testified that she observed two cars on the street that Plaintiff Arbuckle "along with the group" were blocking.

125.     Defendant Vera testified that one car was behind the "group" and one car was in front of the "group."

126.     Defendant Vera testified that Plaintiff Arbuckle was "two inches" in front of the car behind the "group."

127.     Defenant Vera testified that no perceived "protesters" were in front of the second car and that Defendant Vera was not sure if it did not go forward "because [the police] were there."

128.     Defendant Vera testified that she had no idea what the conditions of the traffic lights on 13th Street were at that time, or what sort of traffic signs there were, if any.

129.     Defendant Vera testified that she arrested Plaintiff Arbuckle and two other people, one of whom was "a juvenile."

130.     Defendant Vera testified that there were "no scooters" on 13th Street or Fifth Avenue when Plaintiff Arbuckle was arrested.

131.     Defendant Vera testified she never saw Plaintiff Arbuckle chanting or holding any signs.

132.     The prosecution rested after Defendant Vera's testimony.

133.     Plaintiff Arbuckle testified that he was a 21-year-old student of photography and political science in his Junior year at New York University.

134.     Plaintiff Arbuckle identified himself in video taken by an NYPD officer surveilling and recording the perceived protest.

135.     Among other things, that portion of the video depicts the line of police scooters along Fifth Avenue, which trapped the perceived "protesters."

136.     Plaintiff Arbuckle testified, explaining a scene in the video to the Court: "As I was approaching Fifth Avenue from the west on 13th Street, a lien of police scooters accelerated past me from behind me. They then, when they reached Fifth Avenue they spread onto the sidewalk and into the street."

137.     Based on his recollection and the video evidence, Plaintiff Arbuckle testified: "In the minute before [his arrest he] was walking on the north sidewalk of 13th Street between Sixth Avenue and Fifth Avenue. As I approached Fifth Avenue a line of police scooters accelerated from behind me, spread out on 13th Street, blocking it off on Fifth Avenue. AS I approached the line of police scooters Officer Vera stepped over a scooter from Fifth Avenue and said, "Up against the wall." Initially I thought she was just telling me to get out of the way, so I went up to the wall with my back to it. As she approached me I realized that she intended to arrest me, so I turned around, put my hands behind my back and I said, "I don't understand why I'm being arrested," and I received no answer."

138.     Plaintiff Arbuckle testified that he was on the sidewalk in the minute leading up to his arrest.

139.     Plaintiff Arbuckle testified that he had originally started photographing Occupy Wall Street for a photojournalism class he was talking that fall taught by the Photo Editor of *The New Yorker*. At the end of the class, she suggested that Plaintiff Arbuckle's photographs were good enough to publish, so he continued photographing OWS events and sending edits of the project to her for potential publication.

140.     At the time of his trial, three of his photos from OWS demonstrations were on exhibit at the South Street Seaport Museum.

141.     Plaintiff Arbuckle testified that he did not see any protesters marching in the street or in the street at all on 13th Street between Fifth Avenue and Sixth Avenue within 15 minutes of the time he was arrested.

142.    Plaintiff Soriano testified that he was forty years old and employed as a freelance photographer at the time of the incident, and that he was making photos and videos related to the OWS march.

143.    Plaintiff Soriano testified that he was in front of many people on the sidewalk going east on 13th Street almost at Fifth Avenue when he saw "many police officers blocking the street" and arresting people and as he was observing and documenting that activity "a police officer came behind" him and arrested him.

144.    Third-party witness Ryan Deveraux, who was then working for *The Guardian*, testified that he had been covering the march for Democracy Now!.

145.    Mr. Devereaux testified that he was on the north sidewalk of 13th Street nearing Fifth Avenue, toward the front of the march, with a number of photographers and other journalists, when the march was "headed off by police motor scooters and police vehicles and officers, and a sort of line was formed at that intersection, a line that would run parallel to Fifth Avenue that was blocking the march from proceeding. The scooters were parked … back end to front end so that you couldn't really get through, and then that's when police started coming up the sidewalk. … heading …west …toward the march…Then that's when I saw police throw, sort of throw, push, throw, sort of push photographs who were up at the front of the march up, up against the wall."

146.    Mr. Devereaux testified that traffic was not flowing down 13th Street because "as the march was moving towards Fifth Avenue, while there were police officers flanking the march there was also police officers moving across the intersection of Fifth Avenue and 13th Street, so that was being blocked so that traffic was, couldn't proceed because the intersection was blocked…[by] police scooters."

147.    The Court acquitted Plaintiff Arbuckle of the sole charge after the two-day trial.

148.    After at least three court appearances, Mr. Soriano's criminal case was dismissed and the records related to it were sealed under circumstances consistent with Mr. Soriano's innocence.

149.    Specifically, upon information and belief, Mr. Soriano's case was dismissed on speedy trial grounds.

150.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## **FIRST CLAIM**

**AGAINST ALL DEFENDANTS, EXCEPT AS OTHERWISE LIMITED ELSEWHERE HEREIN, FOR DEPRIVATION OF RIGHTS UNDER THE FIRST, FOURTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

151.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

152.    Defendants, under color of state law, unlawfully seized and arrested Plaintiffs.

153.    Defendants did not have probable cause to arrest Plaintiffs, nor was it objectively reasonable for Defendants to believe that they did have probable cause to arrest Plaintiffs.

154.    Defendants' decision to arrest Plaintiffs was based upon Plaintiffs' First Amendment-protected expression, and not upon Plaintiffs' violation of any provision of the law.

155.    By their conduct and actions and/or omissions in depriving Plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in seizing them, in falsely arresting them, in assaulting and battering them, in retaliating against

them for the exercise of constitutionally protected rights, in maliciously prosecuting them, in inflicting emotional distress upon them, in violating their rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the Defendant CITY OF NEW YORK under their supervision, Defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws, and thereby caused injury and damage in violation of Plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments.

156.    By the conduct described above, Defendants, under color of state law, subjected Plaintiffs to the foregoing acts and omissions without due process of law and in violation of the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving Plaintiffs of their rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

a.  Freedom to engage in protected speech, expression and association, without undue constraint or governmental retaliation;

b.  Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

c.  Freedom from arrest without probable cause;

d.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiffs were aware and did not consent;

e.  Freedom from deprivation of liberty and property without due process of law;

f.  Freedom from malicious prosecution;

22

g.  Freedom from the lodging of false charges against them by police officers;

h.  Freedom from having police officers fabricate evidence against them; and

**i.**  The enjoyment of equal protection, privileges and immunities under the laws.

157.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**SECOND CLAIM**

**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

**ON BEHALF OF PLAINTIFFS AGAINST DEFENDANT CITY AND THE
SUPERVISORY DEFENDANTS**

158.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

159.    By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the Supervisory Defendants caused damage and injury in violation of Plaintiffs' rights guaranteed under the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments, through 42 U.S.C. §1983.

160.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**THIRD CLAIM**

**FAILURE TO INTERVENE**

**ON BEHALF OF EACH PLAINTIFF AGAINST EACH NON-MUNICIPAL DEFENDANT WHO DID NOT DIRECTLY PARTICIPATE IN, BUT KNEW OR SHOULD HAVE KNOWN ABOUT, EACH CONSTITUTIONAL VIOLATION PLAINTIFF COMPLAINS OF HEREIN, INCLUDING, BUT NOT LIMITED TO:**

**ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST DEFENDANTS HALL, TAYLOR, O'DONELL, KNAPP, YNOA, AND PITRE; AND**

**ON BEHALF OF PLAINTIFF SORIANO AGAINST DEFENDANTS HALL, TAYLOR, O'DONELL, KNAPP, YNOA, VERA, AND FERRO**

161.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

162.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the NYPD or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian, or when they observe or become aware of another constitutional violation.

163.    As described above, certain defendants were present for the above-described incident and witnessed other defendants unlawfully arrest plaintiffs.

164.    Defendants' use of force against plaintiffs was obviously excessive and unjustified under the circumstances, because defendants lacked even arguable probable cause to arrest plaintiffs and for other reasons.

165.    Yet defendants who were not involved in the obviously unlawful uses of force related to plaintiffs' arrests and detentions failed to take any action or make any effort to intervene, halt, or protect the plaintiffs from being subjected to those instances of excessive force by other defendants.

166.    Additionally, as discussed elsewhere herein, defendants supervised and otherwise participated in plaintiffs' mass arrest processing, and subjecting them to the No-Summons Policy

24

and the MAPP, thereby participating in plaintiffs' excessive detentions, and/or criminal prosecutions related to the incident, including by creating and forwarding false information to prosecutors, or failing to correct the record when such false information was provided to prosecutors.

167.   Plaintiffs' arrests, the use of process against them, and the initiation and prosecution of criminal charges against them were without probable cause or other legal justification, and were based on facts alleged by defendants, which defendants knew to be false, yet defendants failed to take any action or make any effort to intervene, halt or protect plaintiffs from being unlawfully and wrongfully arrested, detained, and prosecuted.

168.   As a result of defendants' violations of plaintiffs' constitutional rights by failing to intervene in other defendants' clearly unconstitutional uses of force and plaintiffs' unconstitutional arrests and prosecutions, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## FOURTH CLAIM

## FALSE ARREST

### ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST DEFENDANTS HALL, TAYLOR, O'DONELL, KNAPP, YNOA, VERA, AND/OR FERRO; AND

### ON BEHALF OF PLAINTIFF SORIANO AGAINST DEFENDANTS HALL, TAYLOR, O'DONELL, KNAPP, AND/OR PITRE

169.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

170.    As a result of Defendants' conduct as described above, Plaintiffs were subjected to illegal, improper, and false arrest by Defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

171.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## FIFTH CLAIM

## EXCESSIVE USE OF FORCE

**ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST
DEFENDANTS YNOA, VERA, AND/OR OTHER DEFENDANTS; AND**

**ON BEHALF OF PLAINTIFF SORIANO AGAINST
DEFENDANTS O'DONNELL, PITRE, AND/OR OTHER DEFENDANTS**

172.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

173.    As discussed elsewhere herein, Defendants City designed and/or implemented policies and practices pursuant to which those defendants who used force against plaintiffs subjected plaintiffs to excessive force, including in the form of applying unreasonably and even dangerously tight plastic flex-cuffs for excessive periods of time, as well as policies and practices pursuant to which such uses of force were not reported and/or documented.

174.    Plaintiffs were handcuffed with plastic "flexcuffs" behind their backs, not the metal handcuffs normally used by the NYPD, which results in tighter cuffing and as a result more physical pain to the person cuffed.

26

175.   As a result of decades of litigation and related complaints and reports of excessive use of force in connection with the use of plastic flex-cuffs in connection with mass arrests, defendant City knew or should have known that the use of flex-cuffs as opposed to metal handcuffs would result in tighter cuffing and as a result more physical pain to the person cuffed.

176.   Plaintiffs remained handcuffed after they were transported from the scene of their arrests to the mass arrest processing center.

177.   Plaintiffs remained at the mass arrest processing center and in the excessively tight flex-cuffs for longer than they would have had they not been subjected to the No-Summons Policy and the MAPP.

178.   The excessive handcuffing operated along with the other policies and practices articulated to remove protesters from the streets and to penalize and deter perceived participation in OWS-related demonstrations.

179.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, and were otherwise damaged and injured.

## SIXTH CLAIM

## FIRST AMENDMENT

**ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST
DEFENDANTS HALL, TAYLOR, O'DONNELL, KNAPP, YNOA, VERA, AND/OR
FERRO; AND**

**ON BEHALF OF PLAINTIFF SORIANO AGAINST
DEFENDANTS HALL, TAYLOR, O'DONNELL, KNAPP, AND/OR PITRE**

180.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

181.    Defendants engaged in the acts and omissions complained of herein in retaliation for plaintiffs' protected conduct and/or speech.

182.    Defendants engaged in the acts and omissions complained of herein in order to prevent plaintiffs from continuing to engage in protected conduct.

183.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage plaintiffs from engaging in similar protected conduct in the future.

184.    Each plaintiff was actually chilled in that each plaintiff was prevented and /or deterred from participating in protected conduct on the date of and after the incident as a result of defendants' violations of their rights as complained of herein.

185.    In addition to being retaliatory, the restrictions imposed by defendants on plaintiffs' First Amendment rights complained of herein were:

    a.    Not content-neutral and lacked narrowly tailored to promote a compelling government interest;

    b.    Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression;

    c.    Afforded defendants unbridled discretion to limit or deny plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns); and/or

    d.    Amounted to the imposition of strict liability on plaintiffs for participating in protected conduct.

186.    For purposes of plaintiffs' First Amendment-based claims, plaintiffs content that each of the policies, practices, and customs complained of in relation to plaintiffs' *Monell* claims

violated plaintiffs' First Amendment rights, including by targeting perceived participants in OWS demonstrations.

187.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## SEVENTH CLAIM

## MALICIOUS PROSECUTION

### ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST
### DEFENDANTS CITY, O'DONNELL, KNAPP, YNOA, VERA, AND/OR FERRO; AND

### ON BEHALF OF PLAINTIFF SORIANO AGAINST
### DEFENDANTS CITY, O'DONELL, KNAPP, AND/OR PITRE

188.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

189.     Defendants misrepresented and falsified evidence before the District Attorney of New York County ("DANY").

190.    Defendants did not make a complete and full statement of facts to DANY.

191.    Defendant City and/or other Defendants withheld exculpatory evidence from DANY and Plaintiffs.

192.     For example, defense attorneys for Plaintiffs and others who were arrested at approximately the same time and place made formal demands of DANY to preserve and produce, *inter alia*, all documents related to each arrest and to the mass arrest and incident itself, as well as recorded NYPD communications related to the mass arrest.

193.    Upon information and belief, DANY provided those written demands to NYPD.

194.    NYPD did not preserve or produce the demanded materials, including exculpatory materials in the form of recorded NYPD communications related to the mass arrest and the incident.

195.    Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against plaintiffs, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, providing false information to DANY, and, in defendant Vera's case, providing false and perjured trial testimony.

196.    Defendants lacked probable cause to initiate and continue criminal proceedings against plaintiffs.

197.    Defendants acted with malice in initiating criminal proceedings against plaintiffs.

198.    Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiffs.

199.    Defendants lacked probable cause to continue criminal proceedings against plaintiffs.

200.    Defendants acted with malice in continuing criminal proceedings against plaintiffs.

201.    Defendants misrepresented and withheld evidence throughout all phases of the criminal proceedings.

202.    Notwithstanding defendants' misconduct, the criminal proceedings against plaintiffs were favorably terminated on the merits.

203.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CLAIM

### EQUAL PROTECTION – FOURTEENTH AMENDMENT

#### ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST
#### DEFENDANTS HALL, TAYLOR, O'DONNELL, KNAPP, YNOA, VERA, AND/OR FERRO; AND

#### ON BEHALF OF PLAINTIFF SORIANO AGAINST
#### DEFENDANTS HALL, TAYLOR, O'DONNELL, KNAPP, AND/OR PITRE

204.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

205.    For purposes of plaintiffs' Equal Protection-based claims, each of the policies, practices, and customs complained of in relation to plaintiffs' *Monell* claims violated plaintiffs' Fourteenth Amendment rights to equal protection under the laws, including by targeting perceived participants in OWS demonstrations.

206.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## NINTH CLAIM

### EXCESSIVE DETENTION

#### ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST

**DEFENDANTS CITY, HALL, TAYLOR, O'DONNELL, KNAPP, YNOA, VERA, AND/OR FERRO; AND**

**ON BEHALF OF PLAINTIFF SORIANO AGAINST
DEFENDANTS CITY, HALL, TAYLOR, O'DONNELL, KNAPP, AND/OR PITRE**

207.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

208.    As a result of the defendants' acts and omissions complained of herein, plaintiffs were detained without lawful excuse or justification for an unreasonable period of time.

209.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

**TENTH CLAIM**

**DEPRIVATION OF FAIR TRIAL RIGHTS – SIXTH AMENDMENT**

**ON BEHALF OF PLAINTIFF ARBUCKLE AGAINST
DEFENDANTS CITY, O'DONNELL, KNAPP, YNOA, VERA, AND/OR FERRO; AND**

**ON BEHALF OF PLAINTIFF SORIANO AGAINST
DEFENDANTS CITY, O'DONELL, KNAPP, AND/OR PITRE**

210.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

211.    Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which each plaintiff suffered deprivations of liberty.

212.    Each plaintiff suffered significant post-arraignment deprivations of liberty.

213. After each plaintiff's arraignment, each plaintiff was required to return to court multiple times.

214. After each plaintiff's arraignment, the ongoing criminal cases imposed other restrictions were imposed on plaintiffs' abilities to travel.

215. For example, each plaintiff was released on their own recognizance, and as such each plaintiff was subjected at all times to the orders and processes of the court.

216. As a result of the foregoing, plaintiffs were deprived of their liberty and property and Sixth Amendment and other constitutional rights, endured pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise injured.

## ELEVENTH CLAIM

### *MONELL* CLAIMS AGAINST DEFENDANT CITY OF NEW YORK THROUGH 42 U.S.C. § 1983

217. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

218. All of the acts and omissions by the named and unnamed individual police officer Defendants described above were carried out pursuant to policies and practices of Defendant City that were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant City and its agency, the NYPD.

219. Defendant City and the NYPD, by their policy-making agents, servants and employees, including, but not limited to, Defendant Hall and other Supervisory Defendants, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

220.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant City and the NYPD, all under the supervision of ranking officers of the NYPD.

221.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to:

a.    The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies;

b.    The NYPD's use of force and use of force reporting policies and practices;

c.    The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit";

d.    The policy and practice of applying PL § 240.20 (5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic) in circumstances where there is no lawful authority to arrest or detain perceived "groups" of people;

e.    The policy and practice of applying PL § 240.20 (6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given;

f.  The use of arrests in lieu of issuing summonses for summons-eligible offenses;

g.  The use of police resources to corral and trap perceived participants in First Amendment assemblies;

h.  The policy and practice of assigning "arrest teams" of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to "process" the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information; and

i.  The policy and practice of inserting NYPD Legal Bureau and Criminal Justice Bureau agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of.

222.  Defendants' mass arrest-related policies and practices applied in connection with plaintiffs' arrests, arrest processing, and prosecutions employed tactics developed and modified over the course of many years by defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the date of the incident and including events related to OWS in 2011-2012, such as, but not limited to, the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.  *Mandal, et al. v. City of New York, et al.,* 02 Civ. 1234 (SDNY) (WHP)(FM) and the related cases challenging NYPD written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early

as 2001 as a result of which the NYPD began detaining and fully processing through the system persons arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs") (*see, e.g., "Mandal I,"* 2006 WL 2950235 (Oct. 17, 2006) (denying summary judgment to defendants on plaintiffs' First Amendment-based claims (that the policies "constituted facial violations of [Plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations" at *4-6) and Fourteenth Amendment – Equal Protection-based claims (at *6-7); 2007 WL 3376897 (Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandel* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs" at *2);

b. *Burley, et al. v. City of New York, et al.*, 03 Civ. 2915 (SDNY) (WHP)(FM) (class action arising from mass arrests of over 200 demonstrators made during 2002 World Economic Forum in New York City ("WEF") challenging, *inter alia*, (1) NYPD police of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them for consideration for DAT release on the grounds of their perceived participation in protests; and (2) policy and practice of using plastic flex cuffs "was unreasonable and excessive because of the 'manner in which the handcuffs were applied and the length of time in which'" they were handcuffed, *quoting Burley*, 2005 WL 668789 at *8 (March 23, 2005));

36

c. *Allen v. City of Ne York,* 03 Civ. 2829 (SDNY) (JMW)(GWG) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that "the police deliberately held them in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court," *quoting* 466 F.Supp.2d 545 (Dec. 22, 2006);

d. *Haus, et al. v. City of New York, et al.,* 03 Civ. 4915  (SDNY) (RWS)(MHD) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests involving contentions "that the arrests were made without probable cause and pursuant to a Police Department directive to engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing" involving detentions and "systemic delays", according to plaintiffs, "on the basis of identically worded allegations and [where] the charging documents were signed by officers or supervisors who had no knowledge of the facts pertinent to the charges" - "tactics . . . designed to discourage protesters from vigorously expressing their political views," 2006 WL 1148680, *1 (April 24, 2006)) and *Larsen, et al. v. City of New York, et al.*, 04 Civ. 0665 (RWS);

e.  *Kunstler, et al. v. City of New York*, 04 Civ. 1145 (SDNY) (RWS)(MHD), and other related cases brought in the United States District Court for the Southern District of New York arising from purportedly false and retaliatory arrests in connection with police responses to protests on April 7, 2003 containing *Monell* and other claims similar and related to the policies and practices complained of herein;

f. *MacNamara, et al. v. City of New York*, 04 Civ. 9216 (SDNY) (RJS) (JCF) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell, et al. v. City*

*of New York*, 05-CV-8453 (SDNY) (RJS) (JCF), *Schiller, et al. v. City of New York, et al.*, 04 Civ. 7922 (SDNY) (RJS) (JCF), *Dinler, et al. v. City of New York, et al.*, 04 Civ. 7921 (SDNY) (RJS)(JCS), *Kyne, et al. v. Wolfowitz, et al.,* 06-CV-2041 (SDNY)(RJS)(JCF) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes  in the Southern District of New York arising from arrests made, and policies related to, the Republican National Convention in New York City in 2004 (the "RNC") (individual and class actions brought on behalf of over 1,800 RNC-related arrestees in which the plaintiffs raised *Monell* and other claims similar and related to the policies and practices complained of herein) (*see, e.g., MacNamara*, 2007 WL 755401, at *8 (S.D.N.Y. Mar. 14, 2007) (plaintiffs sought discovery of communications they asserted were "made in furtherance of a scheme in which Legal Bureau attorneys 'aid[ed] in the systematic falsification of affidavits by arresting officers' when they met with them as part of RNC mass arrest processing, citing "evidence that the articulated probable cause was not, in many cases, a true account of the officer's observations"); (considering deposition testimony developed in the RNC cases, the Court's holdings that "one reasonable interpretation of Officer Cai's testimony is that he included false information in the narrative section of his booking report because he was instructed to do so by a Lieutenant in the NYPD Legal Bureau. More disturbing still, Officer Cai's testimony appears to indicate that this unlawful act was not an isolated incident," *MacNamara*, 2007 WL 3196295, at *1 (S.D.N.Y. Oct. 30, 2007); that Cai's testimony "can be construed as indicating that Sergeant Cai recorded events that he did not witness as if he had personally observed them. That could well

constitute a fraud, since subsequent participants in the arrest procedure-and ultimately the criminal court-would be expected to rely on the accuracy and reliability of the arresting officer's narrative," and that if plaintiffs could make a "showing that an arresting officer recorded false information and did so in response to instructions that he or she received. Those instructions would then be discoverable, even if they would otherwise have been protected by the attorney-client privilege, *id*. at *2); *Schiller*, 2008 WL 200021 at *2-5 (January 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the City's alleged policy of creating false sworn statements supporting the arrests" and various members of the NYPD Legal Bureau alleged to be responsible for the systematic creation of perjured sworn statements" as well as "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara,* 275 F.R.D. 125, 154 (May 19, 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class, comprising of all RNC arrestees who were processed pursuant to the" RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs…."); *Dinler*, 2012 WL 4513352 (SDNY Sept. 30, 2012) at *3-12 (grating plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of persons mass arrested on August 31, 2004 RNC in connection with a War Resisters League march) and at *12-15 (denying defendants' motion for summary judgment on false arrest claims related to August 31, 2004 mass arrests at East 16[th] Street);

g. *Callaghan, et al. v. City of New York, et al.,* 07-CV-9611 (SDNY) (PKC)(JLC) (including the Third Amended Complaint therein, Dkt. No. 14 (*"Callaghan* TAC*"*) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to those pleaded herein, *see, e.g., Callaghan* TAC at Paragraph 143);

h. *People v. Pogan,* 06416-2008 (Sup. Ct., N.Y. Co.) (NYPD officer Patrick Pogan, who purposefully swore out a false complaint and used excessive force against Christopher Long, a peaceful participant in a Critical Mass bicycle ride, was convicted of falsifying police records by saying that he had observed Mr. Long commit violations when he had not in fact done so, and Pogan was prosecuted for recklessly using physical force; his defense with respect to falsifying the police records was that his supervisor instructed him to fill out the paperwork to create the impression that he had observed Mr. Long engage in unlawful conduct when in fact he had not);

i. *Long v. City of New York*, 09-CV-6099 (SDNY) (AKH) (related civil litigation);

j. *R.J. Osterhoudt v. City of New York, et al.*, NO. 10 CV 3173 (EDNY) (RJC)(RML) (including the Second Amended Complaint and Demand for Jury Trial therein, Dkt. No. 22) (in which a plaintiff arrested on election night in November 2008 in Williamsburg, New York and who observed "NYPD officers picking fights and indiscriminately arresting bystanders" was "swept up in the mass arrests, . . . charged with obstructing governmental administration, resisting arrest, and disorderly conduct and detained for 17 hours before his charges were adjourned in contemplation of

dismissal" alleged that "he was unlawfully arrested as part of the NYPD's custom of sweeping up arrestees at demonstrations without making individualized determinations of probable cause" and that "[t]o prop up these bad arrests, the NYPD . . . customarily encourages officers to swear false criminal complaints and discourages honest officers from reporting misconduct" and the Court denied defendants' bid to dismiss his *Monell* claims, which  Osterhoudt supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum" including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis . . . [that] Osterhoudt alleges . . . caused his own arrest on November 5, 2008" and that "the NYPD failure to train officers how to determine individual probable cause, instead of sweeping up arrestees *en masse*, is the same failure that led to his own unlawful arrest," 2012 WL 4481927, at \*1-2 (E.D.N.Y. Sept. 27, 2012);

k.  The at least sixty 1983 actions filed in the SDNY arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-Civ-5253 (SDNY) (LTS) (Dkt. No. 13) at Paragraph 89 (listing by caption and docket number many OWS-related cases as of March 13, 2015), and including those OWS cases in which the *Arbuckle* defendants are named as defendants or have testified as a witness;

l.

m.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication entitled Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street, published July 25, 2015, available online at http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf (last checked September 9, 2015); and

n.  Other litigation in which the defendant City and/or the named defendants in this case were also named as defendants or testified as witnesses, relevant to plaintiffs' *Monell* claims.

223.  For example, on May 1, 2001, the NYPD adopted a written policy of denying arrested protesters individualized consideration for Universal Summons ("summons") or Desk Appearance Ticket ("DAT") release, which stated, in pertinent part: "Effective immediately, a Universal Summons returnable to Criminal Court or a Desk Appearance Ticket may not be issued for any offense committed at or in connection with a demonstration or similar event at which more than twenty people are participating. All persons arrested at such events must be processed on-line." *Mandal I* at *1, *3.

224.  Then, as now, a DAT was legal process consisting of "'an appearance ticket issued in lieu of [more prolonged] detention, at the direction of a [NYPD] desk officer, for misdemeanors, violations, and certain Class 'E' felonies for hospitalized prisoners,'" *Mandal I* at *1 (internal citations omitted).

225.  Similarly, a Universal Summons was and remains legal process issued in lieu of more prolonged detention by NYPD officers for certain violations and misdemeanors.

42

226.     Approximately 38 *Mandel* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs." *Mandal II* at *2.

227.     As demonstrated in the discovery developed in the cases cited above and discussed above, the NYPD enacted similar policies and practices in connection with policing the 2002 WEF and 2003 anti-war protests in the run-up to the 2004 RNC.

228.     In the period before the 2004 RNC beginning in early 2003, defendant high-level NYPD policymaking officials on the NYPD's Executive Committee were personally involved in planning aspects of the NYPD's response to the 2004 RNC and other protest activities, including the NYPD's responses to anticipated mass protests, mass arrests, and mass arrest processing and prosecution in connection with the RNC.

229.     The NYPD's final RNC mass arrest processing plans included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's Legal Bureau.

230.     The NYPD's final mass arrest processing plan (the "RNC MAPP") included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's CJB.

231.     The Defendant City adopted a "No-Summons" policy with respect to RNC-related arrestees.

232.     As a result of the Defendant City's and the NYPD's crowd and disorder control planning, the NYPD engaged in mass arrests during the 2004 RNC.

233.     Between August 27, 2004 and September 2, 2004, there were over 1,800 RNC-related arrests.

234.    As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD failed to make individualized determinations of probable cause in connection with many RNC-related arrests.

235.    As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, excessive force was used against many arrestees without any meaningful NYPD documentation.

236.    As a result of the City's and the NYPD's mass arrest policies and practices, the No-Summons policy, and the RNC MAPP, RNC-related arrestees' arrest-to-release time vastly exceeded the time it would have taken them to be released with a summons, and in many cases doubled and otherwise far exceeded non-RNC-related arrestees' arrest-to-arraignment times.

237.    As a result of the City's and the NYPD's mass arrest policies and practices, the no-summons policy, and the RNC MAPP, the New York State Supreme Court held Defendant City in contempt of court for failing to release hundreds of arrestees who had been detained in excess of 24 hours without justification for the delay, some of whom had been detained for more than 72 hours.

238.    As a result of the City's and the NYPD's mass arrest plans and the RNC MAPP, NYPD officers who had not in fact witnessed the conduct leading up to a person's arrest filled out NYPD paperwork and in a significant number of cases swore out criminal court complaints swearing that they had seen conduct they had not in fact seen.

239.    As a result of the NYPD's RNC-related conduct, the defendant City and hundreds of NYPD officers were defendants in dozens of lawsuits challenging, among other things, the City's disorder control, mass arrest, use of force, and mass arrest processing and prosecution polices, procedures, customs, and practices.

240.    After around a decade of discovery and litigation, much of which is relevant to Plaintiffs' *Monell* claims herein, the bulk of the RNC cases settled for approximately $18 million, and all of the RNC-related cases have since been resolved.

241.    After the RNC and before OWS, defendant City continued to employ the policies, practices, and customs complained of in the RNC cases and in the other pre-2004 cases discussed above in connection with a years-long crackdown on Critical Mass bicycle rides, litigation over which also occurred in the *Callaghan* case, as well as other cases such as *Long v. NYC. See, e.g., Callaghan* TAC at Paragraph 143 (listing *Monell* claims).

242.    The vast majority of the arrests made in connection with the 2004 RNC resulted in dismissals.

243.    The vast majority of the arrests made in connection with the Critical Mass arrests that were the subject of *Callaghan* resulted in dismissals.

244.    Prior to OWS, the *Callaghan* litigation settled for approximately $1 million.

245.    Many of the RNC cases, as well as the *Callaghan* litigation, involved, *inter alia*, challenges to mass arrests made by police using scooters to form police lines to trap protesters.

246.    Between 2004 and January 1, 2012, the NYPD's mass arrest, crowd control, and mass arrest processing and prosecution policies, practices, and customs complained of herein were the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD officers engaging in uses of excessive force in connection with crowd control while policing protests, and complaints to the Civilian Complaint Review Board, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

247.     Despite those complaints, defendant City failed to modify the NYPD's mass arrest, crowd control, and mass arrest and prosecution policies, practices, and customs complained of herein, and failed to train and/or supervise NYPD officers in connection with properly policing First Amendment assemblies and processing arrests in connection therewith.

248.     Additionally, defendant City failed to discipline NYPD supervisors and officers in connection with whom such complaints were made.

249.     For example, upon information and belief, until approximately October of 2015 or thereafter, the NYPD did not have any meaningful use of force reporting requirement in connection with force aside from force used in gun discharges.

250.     Upon information and belief, the only required use of force reporting during the relevant time period was a box to be filled out in a single NYPD arrest processing-related form with only a few options to describe the nature of the force used.

251.     For example, on October 1, 2015, the New York City Department of Investigation Office of the Inspector General for the NYPD issued an 89-page report entitled "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices" (available online at http://goo.gl/8Nwvoy) (last visited October 2, 2015).

252.     For example, the report reviewed more than 175 cases where force uses were reported to the Civilian Complaint Review Board between 2010 and 2014 and determined that "In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force," imposing "no discipline with respect to 37 of 104, or 35.6%, of substantiated allegations in which OIG-NYPD's independent review confirmed that officers used excessive force that was not warranted under the circumstances."

253.    Upon information and belief, at all times relevant herein, defendant City policymakers routinely received reports regarding mass or large-scale arrests made in connection with perceived First Amendment assemblies, including Unusual Occurrence Reports, Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases, and internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event, including arrests, mass arrest processing, and/or prosecutions.

254.    Beginning in around at least September of 2011, defendant City became aware of OWS.

255.    Between September 17, 2011 and January 1, 2012, the NYPD Commissioner and other high-level NYPD and City policymakers met at least three times a week and regularly discussed OWS at those meetings as well as during extra meetings specifically related to OWS.

256.   During those meetings, defendant City refined and adopted an unconstitutional policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses (the "No-Summons Policy") based on their perceived association with OWS.

257.   During the relevant time period, defendant City refined and ultimately adopted an unconstitutional policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information, all as part of an unreasonably lengthy and punitive mass arrest processing plan (the "MAPP").

258.   The No-Summons Policy and the MAPP were directed at and targeted political demonstrations perceived to be associated with OWS.

259.   Plaintiffs were ultimately subjected to the No-Summons Policy and the MAPP because the NYPD believed they had participated in political protest related to OWS.

260.   According to NYPD procedures codified in the NYPD's Patrol Guide in effect at the time of the incident, which reflected the NYPD's official policies and practices, persons detained or arrested for non-criminal violations such as those for which plaintiffs were presumably detained, as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, are normally eligible for individualized determinations of eligibility for release with a Universal Summons rather than being held in custody for DAT issuance or arraignment.

261.   At all times relevant herein, detainees released with a summons were typically in NYPD custody for an average of between around two to four hours.

262.   In sum and substance, as a result of the No-Summons Policy, plaintiffs did not received individualized consideration for summonses, but instead were held in custody for longer based on the police perception that they had participated in a demonstration associated with OWS.

263.   As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were handcuffed and held in custody for longer than similarly situated "non-OWS related" arrestees would have been.

264.   The No-Summons policy and the MAPP were adopted and applied to plaintiffs, based on malicious, bad faith intent to inhibit or punish plaintiffs' exercise of their rights

protected under the First Amendment of the United States Constitution, among other rights, based on their perceived association with OWS.

265.   As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were detained for an unreasonable length of time.

266.   As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs' releases were delayed for the purpose of gathering additional evidence to justify the arrest.

267.   As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases based on ill-will toward their perceived association with OWS.

268.   As a result of the application of the No-Summons Policy to plaintiffs, defendants delayed plaintiffs' releases for delay's sake, and/or to punish them for their perceived association with OWS.

269.   As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases to deter and/or prevent them from participating in further OWS-related demonstrations.

270.   The application of the No-Summons Policy and the MAPP to plaintiffs violated plaintiffs' First, Fourth, Sixth, and Fourteenth Amendment rights.

271.   The NYPD engaged in hundreds of arrests related to OWS between September 17, 2011 and December 1, 2012.

272.   Only a very small number of those prosecutions resulted in convictions.

273.   The vast majority of those prosecutions resulted in dismissals.

274.    Despite decades of litigation over the recurring problems framed by plaintiffs' *Monell* claims herein, defendant City and the Supervisory Defendants, including specifically failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with, the policies, practices, and customs complained of.

275.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

276.    Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Compensatory damages against the Defendants jointly and severally; and

B.    Punitive damages against the individual Defendants; and

C.    Attorney's fees and costs pursuant to 42 USC §1988; and

D.    Such other and further relief as the Court deems just and proper.

DATED:      Queens, New York
            October 2, 2015

Respectfully submitted,

_____
Gideon Orion Oliver

*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY  10007
t: 646-263-3495