UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

ALEXANDER ARBUCKLE and JAVIER
SORIANO,

                             Plaintiffs,

      -v-

THE CITY OF NEW YORK; NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
PATROL JAMES P. HALL; NYPD DEPUTY
COMMISSIONER OF LEGAL MATTERS
("DCLM") OFFICER KEVIN O'DONNELL; NYPD
CAPTAIN WILLIAM TAYLOR; NYPD
SERGEANT RICKIE KNAPP; NYPD SERGEANT
SALVATORE FERRO, SHIELD NO. 02819, NYPD
OFFICER ELISHEBA VERA, SHIELD NO. 25318;
NYPD OFFICER FREDDY YNOA, SHIELD NO.
18851; and NYPD OFFICER DENISE PITRE,
SHIELD NO. 14589,

                             Defendants.

———————————————————————————

**MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

**Index No. 14-cv-10248 (ER)**

**ECF CASE**

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY 10007
646-263-3495

## TABLE OF CONTENTS

**TABLE OF CONTENTS**…………………………………...………...……………..i

**TABLE OF AUTHORITIES**…………………………………………...…………iii

**PRELIMINARY STATEMENT**…………………………………………………..1

**STATEMENT OF FACTS**…………………………………………...……………1

**ARGUMENT**

       **APPLICABLE STANDARDS** ...............................................................6

       **POINT I**

       **THE PLEADINGS ARE NOT "INCONGRUOUS" AND
DO NOT CONTAIN "ADMISSIONS"**…………………………….…….…7

       **POINT II**

       **THE FAC ADEQUATELY PLEADS PERSONAL
INVOLVEMENT AS TO EACH DEFENDANT**………...........................…… 8

       **POINT III**

       **PLAINTIFFS' FALSE ARREST CLAIMS ARE ADEQUATELY
PLEADED** …………..…………………………………….…………….........… 15

       **POINT IV**

       **PLAINTIFFS' EXCESSIVE FORCE-BASED CLAIMS
ARE ADEQUATELY PLEADED**………………………………...……… 20

       **POINT V**

       **PLAINTIFFS' SIXTH AMENDMENT-BASED FAIR
TRIAL RIGHTS CLAIMS ARE ADEQUATELY
PLEADED**………..…………………………………………….………………….22

       **POINT VI**

       **PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS ARE
ADEQUATELY PLEADED**………………………………………...……… 24

**POINT VII**

**PLAINTIFFS' REMAINING CLAIMS BASED IN THE FIRST,
FOURTH, AND FOURTEENTH AMENDMENTS
ARE ADEQUATELY PLEADED**…………………………………………25

**POINT VIII**

**DEFENDANTS ARE NOT ENTITLED TO
QUALIFIED IMMUNITY**…………………………………………………..30

**POINT IX**

**THE FAC ADEQUATELY PLEADS PLAINTIFFS'
*MONELL* CLAIMS**…................…………….....................………………........... 32

**CONCLUSION**……………………………………………………………………35

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) …………………..…….…..……..……..…….6

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) …………………………………

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) …………………..……..…….6

*Blue Tree Hotels Inc. v. Starwood Hotels & Resorts*, 369 F.3d 212 (2nd Cir. 2004)….....6

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ………..……..……..……..……..……

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)… ……..……..……..…………..……

*Broughton v. State*, 37 N.Y.2d 451 (1975) …..……..……..……..……..……..…16

*Brown v. City of New York,* 2015 WL 4924395, (2nd Cir. Aug. 19, 2015)…………….21

*Buckley v. Valeo*, 424 U.S. 1 (1976) …..……..……..……..……..……..…….26

*Burley v. City of New York*, 2005 WL 668789, (March 23, 2005) ……………….21

*Calamia v. City of New York,* 879 F.2d 1025 (2d Cir.1989) ………………………21

*Carpenter v. City of New York*, 984 F. Supp. 2d 255 (S.D.N.Y. 2013)…………………9

*Colon v. City of New York*, 2009 WL 4264462 (EDNY Nov. 25, 2009)……………...…

*Davis v. Rodriguez*, 364 F.3d 242 (2nd Cir. 2004) ………………………………………

*Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977)…… …………………………..……

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ………………………………………16

*Dickerson v. Napolitano*, 604 F.3d 732 (2nd Cir. 2010) ………………………16

*Dinler v. City of New York,* 2012 WL 4513352 (SDNY Sept. 30, 2012) ……….……16

*Dorsett v. County of Nassau,* 732 F.3d at 157 (2nd Cir. 2013) …………………………26

*Garnett v. City of New York,* 2014 WL 395094 (SDNY Aug. 13, 2014) …………...9

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015)..,

*Graham v. Connor*, 490 U.S. 386 (1989) ……………………………………………20

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)…………………………………

*Hershey v. Goldstein*, 938 F. Supp. 2d 491 (S.D.N.Y. 2013) ………………………21

*Higginbotham v. City of New York*, 2015 WL 2212242 (SDNY May 12, 2015)……24,

*Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013). …….…..…….….…….

*Jocks v. Tavernier,* 316 F.3d 128 (2d Cir.2003) …………………………………….

*Jones v. Parmley*, 465 F.3d 46 (2nd Cir. 2006) ………………………………….18, 19,
26

*Kolender v. Lawson*, 461 U.S. 352 (1982)……… ……..…….…………………………26

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2nd Cir. 1991)…..…………………………6

*Lebowitz v. City of New York*, 606 Fed.Appx. 17
  (2nd Cir. June 2 2015) …………………………………..…………………26

*MacNamara v. City of New York*, 275 F.R.D. 125 (SDNY 2011)…….………….21, 25

*Mack v. Town of Wakill*, 253 F.Supp.2d 552 (SDNY 2003) ……… .......................… 9

*Meagher v. Safir*, 272 AD2d 114 (1st Dept. 2000) …………………………………20

*Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, (2nd Cir. Sept. 11, 2015) …………..22

*Ornelas v. United States*, 517 U.S. 690 (1996)…………………………..,……………..15

*Osterhoudt v. City of New York*, 2012 WL 4481927 (EDNY Sept. 27,2012)………6

*People v. Baker*, 20 NY3d 354 (2013)…… …..……………………………….……18

*People v. Barrett*, 13 Misc.3d 929 (N.Y. City Crim. Ct. 2006)…………………………17

*People v. Bezjak*, 11 Misc.3d 424 (N.Y.City Crim.Ct.,2006),
  *aff'd*, 26 Misc.3d 130(A) (1st Dept., 2010),
  *cert den'd*, 15 N.Y.3d 747 (2010) …………………………………………..17,
28

*People v. Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000)…………………………17

*People v Biltsed*, 574 N.Y.S.2d 272 (N.Y. Crim. Ct, 1991)…..………………..…………

*People v. Carcel*, 165 N.Y.S2d 113 (1957)… …..…………………………………………..18

*People v. Collins*, 44 Misc.2d 430 (N.Y. Sup. 1964)… ….…………………..…………..17

*People v. Epton*, 19 N.Y.2d 496 (1967)…. …..……………………………………….….

*People v. Fitzgerald*, 12 Misc.2d 1190(A) (N.Y.City Criminal Court, 2006)…………17

*People v. Griswald*, 648 N.Y.S2d 901 (N.Y. Co. Ct., 1996)…. ……………..……….…..19

*People v. Jones*, 9 NY3d 259 (2007)….. …..…………………………………………..18

*People v. Kauff, et al.,* 34 Misc.3d 137(A),
   (Appellate Term, 9th and 10th Dists., Dec. 27, 2011) …………………………….……19

*People v. Losinger*, 313 N.Y.S2d 60 (Rochester City Crim. Ct. 1970…..……..……….18

*People v. Millhollen*, 713 NS2d 703 (City Ct. 2004)………..…………………………..17

*People v. Mims*, 984 NYS2d 633 (NY City Criminal Court 2014)… …..…………..….17

*People v. Nixon*, 248 N.Y.2d 182 (1928)…. …..…………………………………..……..18

*People v. Pritchard*, 27 N.Y.2d 246 (1970)……………..……..…………………17, 18

*People v. Rothenberg*, 15 N.Y.S2d 447 (N.Y. Magistrate Ct. 1939)……………..…….16

*People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960)….. ………………….…..19

*People v. Turner*, 48 Misc.2d 611 (App. Term. 1st Dept., 1965)… …………..……….19

*People v. Weaver*, 16 NY3d 123 (2011)….. …..…………………………………………..18

*Pluma v. City of New York*, 2015 WL 1623828 (SDNY March 31, 2015) …………27

*Provost v. City of Newburgh*, 262 F.3d 146 (2nd Cir. 2001). ……………………………9

*Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (June 18, 2015) ………………….…

*Ricciuti v. NY City Transit Authority*, 124 F.3d 123 (2nd Cir. 1997) ………………..22-
23

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ………………………………

*Schiller, et al. v. City of New York,* 2008 WL 200021 (January 23, 2008) ……………9, 18, 22-24

*Soares v. Connecticut*, 8 F.3d 917 (2nd Cir. 1993) ……………………………………21

*Zahrey v. Coffey*, 221 F.3d 342 (2nd Cir. 2000) ……………………………………22

*Zellner v. Summerlin*, 494 F.3d 344 (2nd Cir. 2007) ……………………….........16

**FEDERAL STATUTES**

Fed.R.Civ.P. 12…………………….......................................................................... 6

**NEW YORK LAWS**

New York State Penal Law ("PL") 240.20……........................................................18-19

New York State Penal Law ("PL") 240.20(5)……........................................................18

New York State Penal Law ("PL") 240.20(6)……........................................................8, 16

N.Y. Civ. Rights Law Section 79-h(b)...…………………………….…………..27

## PRELIMINARY STATEMENT

Plaintiffs ALEXANDER ARBUCKLE and JAVIER SORIANO submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss, including Defendants' Memorandum of Law in support thereof (Dkt. No. 25, the "Defendants' MOL"). The Complaint initiating this matter was filed on December 31, 2014. *See* Dkt. No. 1 (the "Complaint"). In lieu of answering, Defendants filed a motion to dismiss on September 11, 2015. *See* Dkts. No. 17-19. After receiving it, counsel for Plaintiffs Mr. Arbuckle's criminal court file as well as a transcript of the criminal court trial arising from the incident. *See* January 19, 2016 Declaration of Gideon Orion Oliver in Opposition to Defendants' Motion to Dismiss (the "Oliver Decl.") at Paragraph 5. On October 2, 2015, Plaintiffs filed a First Amended Complaint (Dkt. No. 20, the "FAC"). Defendants then moved to dismiss again. The facts recited below are taken from the FAC.

## STATEMENT OF FACTS

Plaintiffs Alexander Arbuckle and Javier Soriano were arrested at around 2:30AM on January 1, 2012 near the intersection of 13th Street and 5th Avenue in New York County while covering a demonstration related to Occupy Wall Street ("OWS") as journalists. FAC 2-3. OWS was a political movement dedicated to addressing interconnected grievances of the 99% *vis a vis* the 1%, including income inequality. FAC 2. On December 31, 2011, Plaintiffs were both in Zuccotti Park to document an OWS celebration and police response to it. FAC 23. They intended to document newsworthy protest activity and police responses for potential broadcast and dissemination. FAC 24-25, 32.

Mr. Arbuckle was a Junior at New York University studying photography and political science. 133. He had originally started photographing Occupy Wall Street he had been taking taught by *The New Yorker*'s Photo Editor, who suggested that his photographs were good enough to publish, so he continued photographing OWS events and sending edits of the project to her for potential publication. FAC 139. At the time of his criminal trial, three of his OWS photos were on exhibit at the South Street Seaport Museum. FAC 140. Mr. Soriano was a freelance photographer at the time of the incident. FAC 142.

When, after midnight on January 1, 2012, some OWS demonstrators left the park in groups, Plaintiffs followed them for several miles as they marched from lower Manhattan to the East Village. FAC 26-27. The demonstrators and Plaintiffs were accompanied by NYPD officers, including some or all of the Defendants, who directed and facilitated the demonstration. FAC 28-29.

Just before their arrests at around 2:30AM at around the intersection of 13th Street and 5th Avenue, Plaintiffs had both been walking on the sidewalk on 13th Street heading east toward 5th Avenue, when a line of police scooters accelerated past Mr. Arbuckle and blocked off the intersection of 13th Street and 5th Avenue, trapping Plaintiffs and others on 13th Street. FAC 30, 33, 35, 38, 136-138, 141, 143, 145-146.

Police gave no orders to disperse prior to forming the line of scooters. FAC 34. No police officer gave either Plaintiff any dispersal order prior to Plaintiffs' arrests. FAC 69-72. No witness at Mr. Arbuckle's trial testified that any dispersal orders were given. FAC 75, 115-116, 118-132, 136-138, 141, 143, 145-146. In fact, the Office of the District Attorney of New York County ("DANY") was forced to drop the Disorderly Conduct

charge premised on Mr. Arbuckle's allegedly having violated a lawful dispersal order entirely just before trial based on such a complete lack of proof that the prosecutor dismissed the charge before trial. FAC 115-116.

Prior to their arrests on the sidewalk near the intersections of 13th Street and 5th Avenue at around 2:30AM, Plaintiffs did not block vehicular or pedestrian traffic on 13th Street. FAC 31-33, 38-39, 73-74, 136-138, 141, 143, 145-146.

As Mr. Arbuckle approached the line of scooters walking on the sidewalk, Defendant NYPD Officer Elisheba Vera shouted to him, "Up against the wall!" and physically placed him under arrest him. FAC 36-37, 137.

As Mr. Soriano approached the line of scooters walking on the sidewalk, without warning, he was approached from behind by unidentified NYPD officers and Defendant NYPD Legal Bureau attorney Detective Kenneth O'Donnell[1]. FAC 40, 143. Defendant O'Donnell and two other unidentified NYPD officers detained Plaintiff Soriano up against a wall. FAC 41. After Defendant O'Donnell asked another Supervisory Defendant whether Plaintiff Soriano was under arrest or not, Mr. Soriano explained to Defendant O'Donnell and the other officers present that he was a photojournalist, not a protester, but the Supervisory Defendant directed Defendant O'Donnell that Plaintiff Soriano was under arrest. FAC 42-44. Rather than releasing Plaintiff Soriano, Defendant O'Donnell to surrender Plaintiff Soriano to other officers for mass arrest processing, which he did. FAC 45.

Plaintiffs were placed in plastic flex-cuffs and transported to a NYPD facility for mass arrest processing. FAC 37, 46.

---

[1]     Defendants say that Defendant O'Donnell's first name is Kenneth and that his correct rank is Detective on the cover of Defendants' MOL, at n. 1.

The average time from arrest to release on a summons in Manhattan is around two hours. FAC 56-57. However, Plaintiffs were in custody for around seven hours each before being released with a Desk Appearance Ticket ("DAT"). FAC 99.

As described more fully in Points II-III, V-VI, and IX below, and in the portions of the FAC cited therein, all consistent Plaintiffs' *Monell* claims related to Defendants' mass arrest and mass arrest processing-related policies and practices, during that approximately seven-hour time period, Defendants Vera and Pitre, with the assistance and at the direction of other Defendants, processed Plaintiffs' arrests for release with a DAT's rather than releasing them with summonses although they were arrested and ultimately prosecuted for summons-eligible offenses, and creating official NYPD paperwork containing false narratives about the circumstances leading up to Plaintiffs' arrests, and Plaintiffs' conduct, thereby increasing their arrest-to-release time. Then, after Plaintiffs' releases, Defendants Vera and Pitre provided false information to DANY, based on which Plaintiffs were prosecuted for two Disorderly Conduct violations, one premised on the theory that they had blocked vehicular traffic on 13th Street and one premised on the theory that they refused to comply with a lawful dispersal order.

For example, Defendant Vera included false information in her official NYPD arrest processing paperwork. FAC 90-91. Most of that information was contradicted by her later trial testimony. FAC 92; *compare* FAC 91 *with* 118-131. Defendant Vera also made false written statements to DANY. FAC 100-101. For example, Defendant Vera made statements to DANY prior to swearing out an accusatory instrument charging Mr. Arbuckle with offenses that were contradicted by Defendant Vera's trial testimony, among other things. FAC 102-104; *compare* FAC 103 *with* 118-131. Defendant Vera

further falsely swore out an accusatory instrument based on her false statements to DANY alleging that she had personally observed Mr. Arbuckle commit Disorderly Conduct and arrested him for it, based on which Mr. Arbuckle was charged and prosecuted for Disorderly Conduct. FAC 105-106, 108. That sworn instrument also contained statements that were flatly contradicted by Defendant Vera's later trial testimony. FAC 107; *compare* FAC 105-106 *with* 118-131.

In fact, the prosecution was forced to drop the Disorderly Conduct charge premised on Mr. Arbuckle's allegedly having violated a lawful dispersal order entirely, and there was no testimony at trial by any witness that any dispersal order was given prior to Mr. Arbuckle's arrest. FAC 75, 115-116, 118-146.

While their cases were pending, Plaintiffs suffered significant post-arraignment deprivations of liberty, including in the form of having to remain subjected at all times to the orders and process of the Court and having to appear in court numerous times. FAC 212-215. For example, Mr. Soriano made at least three such appearances before his case was ultimately dismissed on speedy trial grounds. FAC 148-149.

After at least two court appearances, Mr. Arbuckle's case went to a two-day trial held on May 14, 2012 and May 15, 2012, at which both Plaintiffs and Defendant Vera testified. FAC 114, 117, 147.

At trial, Defendant Vera testified falsely regarding Mr. Arbuckle's conduct as well as NYPD conduct relating to the mass arrest and Mr. Arbuckle's arrest. *Compare* FAC 118-132 *with* 30-37, 70, 72-75, 133-146.

After his two-day trial, Mr. Arbuckle was acquitted of the sole Disorderly Conduct – Blocking Vehicular or Pedestrian Traffic charge against him. FAC 117, 147.

The FAC includes claims[2] brought pursuant to 42 USC 1983 and the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution sounding in false arrest (FAC 156(b) through (d), 169-171), excessive force (FAC 156(b), 172-179), malicious prosecution (FAC 156(f), 188-203), violations of Plaintiffs' rights protected under the First, Fourth, and Fourteenth Amendments (including Due Process and Equal Protection rights) (FAC 156(a), (e), and (i), 180-187, 204-209), violations of Plaintiffs' fair trial rights protected under the Sixth Amendment (FAC 212 (g) and (h), 210-216), and *Monell* claims (FAC 217-275).

## ARGUMENT

### APPLICABLE STANDARDS

Under Fed. R. Civ. P. 12, the Court must assume the truth of all of the facts as pleaded in the FAC and construe all reasonable inferences in Plaintiffs' favor. If there is enough factual matter to "'nudge[] [plaintiff's] claims… 'across the line from conceivable to plausible,'" the case should proceed to discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In addition to the facts in the FAC, the Court may consider "matters of which judicial notice may be taken," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2nd Cir. 1991), including, where appropriate, other "complaints filed in…court," *Blue Tree Hotels Inc. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2nd Cir. 2004); *see also Osterhoudt v. City of New York*, 2012 WL 4481927, at *2 (EDNY Sept. 27, 2012).

---

[2] Though all are designated as "claims," the Supervisory Liability (FAC 158-160) and Failure to Intervene (FAC 161-168) are more properly theories of liability.

## POINT I

**THE PLEADINGS ARE NOT "INCONGRUOUS" AND DO NOT CONTAIN "ADMISSIONS" (RESPONDING TO PP. 3-4, 7 OF DEFENDANTS' MOL)**

Defendants argue that certain facts in the pleadings are "incongruous", suggest impropriety on the part of Plaintiffs' counsel, and even raise the spectre of sanctions. *See generally* pp. Defendants' MOL at pp. 3-4, *citing* Complaint Paragraphs 56, 45, 67, 72 [sic].

However, the pleadings are not "incongruous" but internally consistent, consistent with each other, and consistent with the facts as documented in the criminal court paperwork and the trial transcript.

For example, the only mention of "dispersal orders" in Paragraph 56 of the Complaint is in a serious of allegations pleaded in the "and/or" alternative, the clear purpose of which, taken in context, is to establish that, when Defendants personally participated in the various aspects of the incident, they had no probable cause to believe that Plaintiffs had committed any offense. The only mention of "dispersal orders" in Paragraph 45 relates to "purported" dispersal orders. And Paragraphs 67 and 72 of the Complaint merely cite Defendants Vera's and Defendant NYPD Officer Denise Pitre's written admissions contained in "NYPD paperwork and in a sworn statement" identifying Defendants NYPD Sergeant Salvatore Ferro and NYPD Captain William Taylor, respectively, as supervisors who "allegedly" – according to the paperwork and statement – gave "allegedly lawful order[s] to disperse". *See* Oliver Decl. Paragraphs 5-14. As the rest of the facts cited in the Complaint make clear, none of those paragraphs cited to by

Defendants, nor any others, constitute admissions that there were dispersal orders or lawful dispersal orders given. To the contrary, the Complaint denies it. So does the FAC.

Additionally, on p. 7 of Defendants' MOL, Defendants cite to Paragraphs 108-109 of the Complaint as admissions "that both Plaintiffs were arrested for violating N.Y. Penal Law [Section] 240.20(6)."  However, those paragraphs contain no such admissions. While Paragraphs 108 and 109 of the FAC state that Plaintiffs were ultimately charged with Disorderly Conduct, based on falsely lodged allegations made by Defendants Vera and Pitre - they do not "admit" anything about what Plaintiffs were "arrested for."

The facts in the FAC, including those recited above, and including the trial testimony described, establish that no dispersal orders were given prior to Plaintiffs' arrests, and that they were not arrested for having committed Disorderly Conduct or any other offense. Finally, upon the filing of the FAC, the FAC superseded the Complaint, so it is completely inappropriate for Defendants to rely on factual allegations in the Complaint, as they do throughout their motion. The Court should therefore reject the self-serving mischaracterizations of the select portions of the Complaint and FAC Defendants cite to in support of their arguments on this connection.

## POINT II

**THE FAC ADEQUATELY PLEADS PERSONAL INVOLVEMENT AS TO EACH DEFENDANT (RESPONDING TO PP. 4-6 OF DEFENDANTS' MOL)**

Defendants argue that the FAC does not sufficiently allege personal involvement, including on Plaintiffs' failure to intervene and supervisory liability theories of liability, of any Defendant other than Defendant O'Donnell. As to Defendant O'Donnell,

Defendants' arguments on this point are silent. *See* Defendants' MOL at pp. 4-6.[3]

However, the FAC adequately pleads personal involvement as to each Defendant –

including their personal involvement on included failure to intervene (FAC 158-160) and

failure to supervise (FAC 161-168) theories of liability and *Monell*-based claim (FAC

217-275) - sufficient to entitle Plaintiffs to discovery.

      "The Second Circuit has defined 'personal involvement' to mean direct

participation, such as 'personal participation by one who has knowledge of the facts that

rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others

to do the unlawful acts.'" *Garnett v. City of New York,* 2014 WL 395094, *7 (SDNY

Aug. 13, 2014) ("*Garnett I*"), *quoting Provost v. City of Newburgh*, 262 F.3d 146, 155

(2nd Cir. 2001). Although "supervisory liability" may indeed be a misnomer, there are

ways in which supervisors may be liable aside from direct and physical participation in

the injury. *See, e.g., Schiller, et al. v. City of New York, et al.* 04 Civ. 7922 (RJS)(JCF)

2008 WL 200021, at *4 (SDNY January 23, 2008) (citing cases). Multiple officers can be

held liable for a single false arrest, malicious prosecution, or other constitutional tort. *See,

e.g., Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013). A particular officer

who was not the "arresting" officer may still face liability if the officer assisted in the

arrest or arrest processing in some other fashion. *See, e.g., Mack v. Town of Wakill*, 253

F.Supp.2d 552, 558 (SDNY 2003); *see also, e.g., Carpenter v. City of New York*, 984 F.

Supp. 2d 255, 268-269 (S.D.N.Y. 2013).

---

[3]     The Court should ignore Defendants' outlandish mischaracterizations of the FAC at p. 5 citing to selective portions of the FAC and otherwise minimizing the roles of the Defendants in the incident as pleaded in the FAC.

Additionally, where defendant officers who knew or should have known of constitutional violations, but failed to intervene, they may also be liable.

In addition to the facts recited in the Statement of Facts above describing the circumstances leading up to Plaintiffs' arrests and the circumstances about their prosecutions, the Court should consider all of the allegations against the Defendants in the FAC, including, but not limited to, those summarized above and below, such as the allegations against all Defendants, *see, e.g.,* 28-30, 55, 61-62, and unidentified NYPD officers, *see, e.g.,* FAC 40-41, 45, the "Supervisory Defendants" (Hall, O'Donnell, Taylor, Knapp, and Ferro), *see, e.g., FAC 14,* 42-44, 49-54, 58-61, 63, 65-67, 80, 220, 275, the facts pleaded in support of the *Monell* claims, FAC 217-275, and the facts summarized below.

**Defendant Officer Vera –** FAC 4, 61, 76, 78-79, 81-92, 96-97, 101-108, 118-132, 137

Mr. Arbuckle identified Defendant Vera as having arrested him. FAC 36, 137. In official NYPD paperwork and statements to DANY, Defendant Vera herself claims to have arrested Mr. Arbuckle. FAC 91, 103, 105-106. Defendant Vera was assigned to process Mr. Arbuckle's arrest as well as other arrests arising from the same mass arrest. FAC 76, 78. Defendant Vera did process Mr. Arbuckle's arrest, including by filling out NYPD paperwork related to Mr. Arbuckle's arrest and the other arrests. FAC 79, 84-85. As part of that process, Defendant Vera met with at least Defendant O'Donnell or another supervisor from the NYPD's Legal Bureau, and Defendant Sergeant Rickie Knapp, after which Defendant Vera filled out NYPD paperwork related to Plaintiffs' arrests containing false information. FAC 81-83, 89, 90. The other facts regarding Defendant

Vera's involvement in Mr. Arbuckle's arrest and prosecution set forth in the Statement of Facts above are not repeated here.

### Defendant Legal Bureau Detective O'Donnell[4] – 40-45, 81

Defendant O'Donnell and two other NYPD officers physically detained and arrested Mr. Soriano. Defendant O'Donnell asked another Supervisory Defendant whether Mr. Soriano was under arrest and when the Supervisory Defendant said yes, Defendant O'Donnell did not release Mr. Soriano. FAC 40-45. Additionally, Defendant O'Donnell or another supervisor from the NYPD's Legal Bureau met with Defendants Vera and Pitre as part of their mass arrest processing duties, after which Vera and Pitre filled out NYPD paperwork related to Plaintiffs' arrests containing false information supplied by other NYPD officers. FAC 81-83. Defendant O'Donnell is also a Supervisory Defendant, and their roles are discussed below.

### Defendant Officer Pitre – 4, 61, 77-79, 81-83, 87, 93-95, 97-98, 101, 109-112

In a sworn accusatory instrument – the only document based on which Mr. Soriano was prosecuted - Defendant Pitre herself claims to have been Mr. Soriano's arresting officer. FAC 109-110. Defendant Pitre was assigned to process Mr. Soriano's arrest as well as other arrests arising from the same mass arrest. FAC 77, 78. Defendant Pitre did process Mr. Soriano's arrest, including by filling out NYPD paperwork related to Mr. Soriano's arrest and the other arrests. FAC 79, 93-94. In NYPD paperwork, Defendant Vera identified Defendant Pitre as having assisted in Mr. Arbuckle's arrest processing. FAC 87. As part of that process, Defendant Pitre met with Defendant O'Donnell or another supervisor from the NYPD's Legal Bureau and/or a supervisor

---

[4]     Notably, Defendants' MOL does not argue that the FAC fails to establish personal involvement with respect to Defendant O'Donnell.

from the NYPD's Criminal Justice Bureau, after which Defendant Pitre filled out NYPD paperwork related to Plaintiffs' arrests containing false information. FAC 81-83, 95, 101. Defendant Pitre falsely swore out an accusatory instrument based on which Plaintiff Soriano was charged with Disorderly Conduct. FAC 109-113.

### Defendant Captain Taylor – 67, 98, 110

In NYPD paperwork and a subsequently sworn accusatory instrument, Defendant Pitre identified Defendant Taylor as a supervisor on the scene and a witness to the circumstances leading up to Mr. Soriano's arrest, as well as the person who gave what Defendant Pitre characterized as an allegedly lawful order to disperse. FAC 98, 109-110. According to Defendant Pitre's sworn accusatory instrument, those instructions allegedly given by Defendant Taylor were "in substance, to stay on the sidewalk and keep moving," which are not dispersal orders under PL 240.20(6) as a matter of law. FAC 109-110, 112-113. Defendant Taylor is also a Supervisory Defendant.

### Defendant Sergeant Ferro – FAC 88, 106

In official NYPD paperwork, Defendant Vera identified Defendant Ferro as a supervisor on the scene and a witnesses to the circumstances leading up to Mr. Arbuckle's arrest, as well as the person who gave what Defendant Vera characterized as an allegedly lawful order to disperse. FAC 86. Defendant Ferro is also a Supervisory Defendant.

### Defendant Sergeant Knapp – FAC 89, 96-97

Defendant Vera met with Defendant Knapp, after which Defendant Vera filled out NYPD paperwork related to Plaintiffs' arrests containing false information. FAC 83, 89, 90. In NYPD paperwork, Defendants Vera and Pitre identified Defendant Knapp as a

supervisor who directed and assisted them in arrest processing and who had a duty to verify the accuracy of, and to sign off on, their paperwork. FAC 96-97.[5] Defendant Knapp is also a Supervisory Defendant.

### Defendant Officer Freddy Ynoa – FAC 61, 86

In official NYPD paperwork, Defendant Vera identified Defendant Ynoa as having assisted in Mr. Arbuckle's arrest. FAC 88.

### Defendant Chief of Patrol James P. Hall – 47-49, 51-52, 58-59, 62-65, 67, 220

The FAC identifies Defendant Hall – then the NYPD's Chief of Patrol – as NYPD Incident Commander with respect to Plaintiffs' arrests as well as the commander actually responsible for making command and control decisions as well as supervisory decisions with respect to all fellow officers on the scene of Plaintiffs' arrests. FAC 14, 47-49, 80 (explaining that according to NYPD procedure the Incident Commander and certain other Supervisory Defendants "had the responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the actual elements of the offense for which each arrest was effected").The FAC also details that:

- At all relevant times on December 31, 2011 and January 1, 2012, all other Defendants were under Defendant Hall in the chain of command, and he actually directed and/or supervised their activities with respect to giving police orders and instructions and supervising, or assisting in arrests or arrest processing, including Plaintiffs' (FAC 62-64)
- On the morning of January 1, 2012, Defendants Hall and/or other Supervisory Defendants made the determination to engage in mass arrests and communicated that determination to subordinates (FAC 65)
- When Defendants Hall, Taylor, and other Supervisory Defendants gave or caused to be given police orders related to the incident and/or directed and/or supervised

---

[5]     As stated in the Oliver Declaration, in Paragraph 97 of the FAC, all references to Defendant Vera should instead refer to Defendant Pitre.

and/or otherwise participated in Plaintiffs' arrests, Defendants did not have probable cause to believe that any Plaintiff had committed Disorderly Conduct or any other offense (FAC 67)

- According to NYPD procedure, Defendant Hall - the Incident Commander - and certain other Supervisory Defendants "had the responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the actual elements of the offense for which each arrest was effected" (FAC 49, 80)
- Defendant Hall's status as high-ranking policymaker on the scene of Plaintiffs' arrests and their responsibilities for making command and control and supervisory decisions with respect to fellow officers on the scene (FAC 47-48)
- Defendant Hall's actual or imputed knowledge that implementation of the NYPD's mass arrest and mass arrest processing policies, practices, and tactics described in the FAC would result in deprivations of constitutional rights and other injuries to Plaintiffs and others (FAC 51-52), including arresting officers filling out NYPD and criminal court paperwork containing false allegations (FAC 59)
- Defendant Hall's involvement in developing and implemented the No-Summons policy and the other mass arrest-related policies and practices complained of in the FAC "in order to keep persons detained in connection with protest activities for excessive periods of time as compared to others detained for summons-eligible offenses and issued summonses" (FAC 58)

Defendant Hall is also a Supervisory Defendant.

### The Supervisory Defendants (Hall, O'Donnell, Taylor, Knapp, and Ferro) – 42-44, 49-54, 58-61, 63, 65-67, 80, 220, 275

The FAC designates and refers to Defendants Hall, O'Donnell, Taylor, and Knapp as the "Supervisory Defendants" - FAC 14 - who commanded and supervised Defendants Vera, Pitre, and Ynoa related to the incident – *see, e.g.,* FAC 28-30, 61 - including in sections describing:

- The Supervisory Defendants' involvement in giving police orders and instructions and/or directing, supervising, or assisting in arrests or arrest processing, including Plaintiffs' (FAC 63, 65-66)
- That, when the Supervisory Defendants gave or caused to be given police orders related to the incident and/or directed and/or supervised and/or otherwise participated in Plaintiffs' arrests, they did not have probable cause to believe that any Plaintiff had committed Disorderly Conduct or any other offense (FAC 67)
- The Supervisory Defendants' status as high-ranking policymakers on the scene of Plaintiffs' arrests and their responsibilities for making command and control and supervisory decisions with respect to fellow officers on the scene (FAC 60)

- The Supervisory Defendants' personal involvement in other, prior OWS-related mass arrests and mass arrest processing (FAC 50)
- The Supervisory Defendants' resulting actual or imputed knowledge that their development or implementation of the NYPD's mass arrest and mass arrest processing policies, practices, and tactics described in the FAC would result in deprivations of constitutional rights and other injuries to Plaintiffs and others (FAC 51-52), including arresting officers filling out NYPD and criminal court paperwork containing false allegations (FAC 59)
- The Supervisory Defendants' involvement in suggesting, ratifying, or enacting policies, practices, or procedures complained of in the FAC, as a result of which, among other things, Defendants:
  - Enacted a "No Summons" policy for summons-eligible offenses in connection with OWS-associated protests (FAC 53)
  - Had assigned arresting officers speak with NYPD Legal Bureau and/or Criminal Justice Bureau officers as part of mass arrest processing procedures (FAC 54)
- The Supervisory Defendants developed and implemented the No-Summons policy and the other mass arrest-related policies and practices complained of in the FAC "in order to keep persons detained in connection with protest activities for excessive periods of time as compared to others detained for summons-eligible offenses and issued summonses" (FAC 58)

Based on all of the foregoing, as well as the rest of the allegations in the FAC, and the reasonable inferences to be drawn therefrom in Plaintiffs' favor, for pleading purposes, the FAC establishes that Defendants were each sufficiently personally involved in the incident such that Plaintiffs should be entitled to pursue discovery.

## POINT III

**PLAINTIFFS' FALSE ARREST CLAIMS ARE ADEQUATELY PLEADED (RESPONDING TO PP. 7-8 OF DEFENDANTS' MOL)**

Plaintiffs' false arrest claims are adequately pleaded. *See, e.g.,* FAC 169-171.

Defendants argue that Plaintiffs' arrests were privileged by probable cause and therefore authorized. The FAC establishes that they were not.

Probable cause is a "mixed question of law and fact", *Ornelas v. United States*, 517 U.S. 690, 696 (1996), to be determined "generally" by looking to state law, *Davis v. Rodriguez*, 364 F.3d 242, 433 (2nd Cir. 2004). Because Plaintiffs were arrested without a

judicial warrant, their arrest were "presumptively unlawful" – and therefore presumptively lacked probable cause - as a matter of law. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2nd Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975). "Whether probable cause exists depends upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added). Any disputed facts are ultimately for a jury to decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2nd Cir. 2007) (citing cases).

Nevertheless, Defendants argue that there was probable cause to arrest Plaintiffs for violating New York State Penal Law ("PL") 240.20(6) (Disorderly Conduct – Failure to Comply with a Lawful Order to Disperse). PL § 240.20(6) states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof. . . He [sic] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."

Probable cause to arrest a person for a PL § 240.20(6) violation exists only where the police give a lawful order to disperse and a meaningful opportunity to comply with it and the person lawfully ordered to disperse refuses to do so after having been given a meaningful opportunity to comply with it. *See* PL 240.20(6); *Dinler v. City of New York*, 04 Civ. 7921 (RJC)(JCS), 2012 WL 4513352, at *11 (SDNY Sept. 30, 2012 (no probable cause to arrest protesters under PL 240.20(6) who had no opportunity to comply with dispersal order); *see also, e.g., People v. Rothenberg*, 15 N.Y.S2d 447, 449 (N.Y. Magistrate Ct. 1939). "Not every police instruction constitutes a 'lawful' order to leave, and the circumstances surrounding such an order must be examined." *People v.*

*Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000); *see also People v. Millhollen*, 713 NS2d 703, 707 (City Ct. 2004) (it is the government's " burden to allege evidentiary facts that the police issued a lawful order to disperse.").[6]

Additionally, the conduct of refusing to comply with a lawful and clearly communicated dispersal order "must be 'reinforced by a culpable mental state to create a public disturbance.'" *People v. Barrett*, 13 Misc.3d 929, 944-946 (N.Y. City Crim. Ct. 2006) (internal quotation omitted); *People v. Pritchard*, 27 N.Y.2d 246, 248-249 (1970).

An arrest, prosecution, or conviction must therefore be based on credible and particularized "facts, either about the defendant's conduct or about the surrounding circumstances, to support an inference that defendant possessed the requisite intent or recklessness." *Id.; accord, People v. Fitzgerald*, 12 Misc.2d 1190(A) at *1 (N.Y.City Criminal Court, 2006).

Critically, the FAC establishes that there were never any orders to disperse directed at them, and Defendants' reliance on purported "admissions" in the Complaint that they characterize as supporting their position is improper. As seen above above,

---

[6]     "Cases discussing a 'lawful order' under PL 240.20(6) have held that, where the accusatory instrument fails to allege the basis for the order, it is facially insufficient." *Id*. By its clear terms, this provision of the Penal Law applies only to circumstances where the police have given an order *to disperse* – other directions, such as orders to "move on" or warnings – do not count. *See, e.g.*, *People v. Jennifer Bezjak,* 11 Misc.3d 424, 436-437 (NYC Crim. Ct.,2006), *aff'd*, 26 Misc.3d 130(A) (App. Term,1st Dept.,2010), *cert. den'd*, 15 N.Y.3d 747-750, 752 (2010) (warnings on flyers and loudspeakers did not constitute "dispersal order"); *People v. Mims*, 984 NYS2d 633, at *3 (NY City Criminal Court 2014) (police directions were not dispersal order within the meaning of PL 240.20(6)); *People v. Collins*, 44 Misc.2d 430, 431 (N.Y. Sup. 1964) (police orders did not constitute orders to disperse). On balance, courts have found that "...if the police officer's direction to move was arbitrary and unreasonable under the circumstances, the [charge] will not stand." *People v. Benjamin*, 185 Misc.2d 466, 468 (N.Y. City Crim. Ct.,2000) (internal citations omitted).

however, beyond that, there was no probable cause to arrest Plaintiffs for a PL 240.20(6) violation - for example, because the facts do not establish that the police would have had authority to give a dispersal order under the circumstances that would have been lawful, given the absence of a clear and imminent threat of serious public ramifications well beyond discommoding some vehicular or pedestrian traffic.

Nor does the FAC establish any cause to arrest Plaintiffs for a PL 240.20(5) violation, although both Plaintiffs were charged with such and Plaintiff Arbuckle was acquitted of the sole 240.20(5) violation he was charged with after trial.

In this connection, as the Second Circuit has held, "New York courts have interpreted [PL § 240.20] to permit punishment only where the conduct at issue does more than merely inconvenience" members of the public. *Jones v. Parmley*, 465 F.3d 46, 59 (2nd Cir. 2006). In those limiting constructions, the New York courts have construed the PL 240.20 statute to ensure its applications are constitutional on basic Due Process, as well as First Amendment, grounds.[7] Against that backdrop, the first and primary test in considering whether particular conduct is criminally disorderly is whether or not there is evidence of violence or a threat of violence or criminally tumultuous conduct – that is, a real breach of the peace. *See, e.g., People v. Pritchard*, 27 N.Y.2d at 248-249; *People v. Losinger*, 313 N.Y.S.2d 60, 62 (Rochester City Crim. Ct. 1970) (citing cases); *Schiller v. City of New York*, 2008 WL 200021, *7 (SDNY, January 23, 2008) (citing cases),

---

[7]     For example, in *People v. Jones*, 9 NY3d 259 (2007), the Court of Appeals specifically reaffirmed a key holding of its seminal Disorderly Conduct decisions in *People v. Nixon*, 248 N.Y.2d 182, 187-188 (1928) and *People v. Carcel*, 165 N.Y.S2d 113, 116 (1957) that "[s]omething more than a mere inconvenience" to the public is required to support a PL § 240.20 arrest, charge, or conviction. *See also, e.g., People v. Weaver*, 16 NY3d 123 (2011); *People v. Baker*, 20 NY3d 354, 360 (2013).

*reconsideration den'd, Abdell v. City of New York*, 2008 WL 2540813, *1 (SDNY June 25, 2008); *aff'd, Schiller v. City of New York*, 2009 WL 497580, *4 (SDNY, Feb. 27, 2009).

While conduct short of a real breach of the peace may also be punished under some circumstances, where serious public disorder is created or imminently threatened, the sort of disruption intentionally or recklessly created or risked punishable by PL 240.20 must be real and physical obstruction of an enduring, rather than temporary, nature. The conduct must create or imminently threaten serious public ramifications beyond inconvenience or annoyance. Under the caselaw, only a person's conduct that has either already "cause[d] inconvenience, annoyance or alarm to a substantial segment of the public or [is] of such nature and character that it would appear beyond a reasonable doubt that the conduct created a risk that a breach of the peace was *imminent*" violates PL 240.20. *People v. Griswald*, 648 N.Y.S.2d 901, 903 (N.Y. Co. Ct., 1996) (emphasis added); *People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960); *People v. Turner*, 48 Misc.2d 611, 620 (App. Term. 1st Dept., 1965) (citing cases), *aff'd*, 17 N.Y.2d 829 (1966), *amended* 18 N.Y.2d 683 (1966), *cert. granted*, 87 S.Ct. 227 (1966), *cert. dismissed*, 87 S.Ct. 1417 (1966); *see also, e.g., People v. Kauff, et al.,* 34 Misc.3d 137(A), (Appellate Term, 9th and 10th Dists., Dec. 27, 2011) ("There is no indication in the record that defendants actually blocked vehicular traffic, a required element of [PL] 240.20(5)") (citing cases); *see also Jones v. Parmley*, 465 F.3d at 57-59 (discussed further in Point VII below). Particularly given the implications of the requirements of the First Amendment and Due Process principles discussed in Point VII below, it is clear that

the FAC does not plead facts on its face based on which the Defendants had probable cause to arrest Plaintiffs for any Disorderly Conduct or any other offense.

**POINT IV**

**PLAINTIFFS' EXCESSIVE FORCE-BASED CLAIMS ARE ADEQUATELY PLEADED (RESPONDING TO PP. 9-10 OF DEFENDANTS' MOL)**

Plaintiffs' excessive force-based claims are adequately pleaded. *See, e.g.,* FAC 172-179. Defendants argue in sum and substance that Plaintiffs have not established that any Defendant was personally involved in using excessive force against them. However, as set forth more fully in Point II above, Plaintiffs have done so. Additionally, as set forth in Point III above, there was no probable cause for Plaintiffs' arrests, so they were not authorized. Because Plaintiffs' arrests were not authorized, all of the force Defendants used on Plaintiffs was excessive. *See, e.g., Meagher v. Safir*, 272 AD2d 114, 115 (1st Dept. 2000).

Beyond that, even assuming, *arguendo*, that there was probable cause for Plaintiffs' arrests, the existence of probable cause alone does not justify uses of force that are excessive under the circumstances. The Court must consider the familiar *Graham v. Connor*, 490 U.S. 386, 396 (1989) factor in determining whether the uses of force at issue were not excessive as a matter of law. As the Second Circuit has recently reemphasized, particularly where, as here, "the severity of the [alleged] crime is unquestionably slight," the Plaintiffs "posed no threat whatsoever to the safety of the officers or others," and were "not fleeing, …nor physically attacking an offer, … nor even making a move than an officer could reasonably interpret as threatening an attack," it is appropriate to "leave[]

20

the factual determination of excessiveness to a jury…" *Brown v. City of New York,* 2015 WL 4924395, *7 (2nd Cir. Aug. 19, 2015).

Additionally, the FAC pleads as an element of their excessive force claims that they were subjected to excessively tight rear-cuffing with plastic flex-cuffs for longer than they would have been but for the Defendants' subjecting them to the No-Summons policy and Mass Arrest Processing Plan ("MAPP"), including to penalize and deter perceived participation in OWS-related demonstrations, as complained of, among other places[8], in connection with Plaintiffs' *Monell* claims. *See, e.g.,* FAC 173-178[9], 221(b), 222(b), 222(f), 222(g), and 246-252, *citing, inter alia, Burley v. City of New York,* 03 Civ. 2915 (SDNY) (WHP)(FM), 2005 WL 668789, at *8 (March 23, 2005) (class action challenging the use of plastic flex-cuffs in connection with 2003 mass arrests of demonstrators on the grounds that the use of the cuffs "was unreasonable and excessive because of the 'manner in which the handcuffs were applied and the length of time'" arrestees remained cuffed); *MacNamara, et al. v. City of New York, et al.,* 275 F.E.D. 125 154 (SDNY May 19, 2011) (case arising from 2004 Republican National Convention ("RNC") certifying class "comprising all RNC arrestees who were handcuffed with plastic flex cuffs"); *see also* Point IX below.

---

[8]     As mentioned in Points VII and IX below, Plaintiffs also challenge the applications of the No-Summons Policy and the MAPP on First Amendment and Equal Protection grounds.

[9]     In this connection, the Second Circuit has rejected "the principle that handcuffing is *per se* reasonable…. In determining whether the force used to effect a particular seizure is reasonable, a court must evaluate the particular circumstances of each case." *Soares v. Connecticut,* 8 F.3d 917, 921 (2nd Cir. 1993); *see also Hershey v. Goldstein,* 938 F. Supp. 2d 491, 519 (S.D.N.Y. 2013); *Calamia v. City of New York,* 879 F.2d 1025, 1035 (2nd Cir. 1989) (denying directed verdict for defendants on excessive force claim where plaintiff was rear-cuffed for around five hours).

The FAC sufficiently alleges for pleading purposes that Plaintiffs were arrested

without justification and that Defendants therefore used excessive force in arresting and

handcuffing them with excessively tight plastic flex-cuffs for excessive periods of time,

pursuant to retaliatory and otherwise unconstitutional policies and practices aimed at

OWS, thereby injuring them.

## POINT V

**PLAINTIFFS' SIXTH AMENDMENT-BASED FAIR TRIAL
RIGHTS CLAIMS ARE ADEQUATELY PLEADED
(RESPONDING TO PP. 17-18 OF DEFENDANTS' MOL)**

Plaintiffs' Sixth Amendment-based fair trial rights claims are adequately

pleaded. *See, e.g.,* FAC 210-216.

> The Second Circuit Court of Appeals has clearly held that "[n]o arrest, no
> matter how lawful or objectively reasonable, gives an arresting officer or
> his fellow officers license to deliberately manufacture false evidence
> against an arrestee. To hold that police officers, having lawfully arrested a
> suspect, are then free to fabricate false confessions at will, would make a
> mockery of the notion that Americans enjoy the protection of due process
> of the law and fundamental justice." *Ricciuti v. NY City Transit Authority*,
> 124 F.3d 123, 130 (2nd Cir. 1997).

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 at *1 (SDNY April 6, 2015)

("*Garnett II*"). The Second Circuit recently reaffirmed that key holding of *Ricciuti. See*,

*e.g., Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, at *7 (2nd Cir. Sept. 11, 2015).

Relatedly, "[E]veryone possesses the . . . 'right not to be deprived of liberty as a result of

the fabrication of evidence by a government officer acting in an investigating capacity.'"

*Id.* *6, quoting Zahrey v. Coffey*, 221 F.3d 342, 349 (2nd Cir. 2000).

> A plaintiff establishes a denial of the right to fair trial claim by showing
> that the defendant fabricated evidence that was likely to influence a jury,
> forwarded that information to prosecutors, and that the plaintiff suffered a
> deprivation of liberty as a result. *Ricciuti,* 124 F.3d at 129-130. **The
> existence of probable cause is not a defense.** *Id*. at 130.

*Garnett I,* 2014 WL 395094, at *12 (emphasis added); *see also Jocks v. Tavernier*, 316 F.3d 128, 138 (2nd Cir. 2003) (citing *Ricciuiti* for proposition that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial....") (cited in *Garnett II* at *4, *8). A trial is not a "prerequisite to such a claim. Indeed, the plaintiffs in *Ricciuti* were not tried; the charges against them were dismissed after a number of adjournments." *Schiller,* 2008 WL 200021, at *9; *accord, Garnett II* at *4 ("In *Ricciuti,* the court did not require that the false information submitted to the prosecutor be used at trial, or even that a trial ever take place—the claim accrues when the officer forwards the false information to the prosecutors"). "The limiting factor appears to be not whether the plaintiff went to trial but whether the falsification caused material harm." *Schiller,* 2008 WL 200021, at *10. Falsifying affidavits and fabricating evidence "such as a post-arrest affidavit that contained allegedly false information, ... an allegedly false and misleading police report, … and an allegedly false narrative of events preceding plaintiff's arrest provided to another officer, who in turn forwarded the information to the prosecutor," all run afoul of the Sixth Amendment. *Garnett I* at *12 (internal citations omitted).

Based on the facts summarized above, the FAC establishes that at least Defendants Vera and Pitre fabricated evidence of a material nature, likely to influence a jury's decision, and intentionally forwarded that evidence to prosecutors*,* as a result of which Plaintiffs suffered significant post-arraignment deprivations of liberty, including while the criminal case against them based on the charges falsely lodged by Defendants against them were pending.

## POINT VI

**PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS ARE ADEQUATELY PLEADED (RESPONDING TO PP. 12-14 OF DEFENDANTS' MOL)**

Plaintiffs' malicious prosecution claims are adequately pleaded. *See, e.g.,* FAC 188-203. Defendants argue that because they say there was probable cause for Plaintiffs' prosecutions, Plaintiffs cannot show malice, and because, they say, Defendants did not "initiate" the prosecutions.

However, in this connection, as well as in the First Amendment First Amendment context discussed below, "'[a] lack of probable cause generally crates an inference of malice," . . . and nothing in the complaint rebuts that inference as a matter of law." *Higginbotham v. City of New York*, 2015 WL 2212242, at \*5 (SDNY May 12, 2015) (citing cases); *see also, e.g., Garnett I* at \*11 ("Furthermore, under both Second Circuit and New York State law, a lack of probable cause to prosecute 'generally creates an inference of malice'") (quoting and citing cases). Beyond that, there are other facts in the FAC, including related to the *Monell* claims based on policies targeting OWS, based on which a jury could ultimately infer malice.

Additionally, contrary to Defendants' arguments, at least Defendants Vera and Pitre, initiated or commenced the prosecutions against Plaintiffs for malicious prosecution purposes. *See, e.g., Ricciutti*, 124 F.3d at 130 (a jury could find that by preparing and forwarding false information to prosecutors, the officer "played a role in initiating the prosecution"); *see also, e.g., Schiller,* 2008 WL 200021, at \*4 (officers who create false reports and 'withhold relevant and material information likely to influence a jury's decision and forward that information to

prosecutors' … can be said to have 'played an active role'" in initiating

prosecutions although they do not "initiate the prosecution" themselves) (internal

citations omitted). Moreover, at least Defendant Vera continued the prosecution,

including through trial. Additionally, upon information and belief, Defendant

Pitre continued the prosecution against Mr. Soriano while it was pending and

before it was dismissed.

Beyond those points, the FAC adequately pleads the elements of

Plaintiffs' malicious prosecution claims sufficient to warrant discovery.

## POINT VII

### PLAINTIFFS' REMAINING CLAIMS BASED IN THE FIRST, FOURTH, AND FOURTEENTH AMENDMENTS ARE ADEQUATELY PLEADED (RESPONDING TO PP. 10-12, 18-21 OF DEFENDANTS' MOL)

Plaintiffs have adequately pleaded their remaining claims based on the

First, Fourth, and Fourteenth Amendments. *See, e.g.,* FAC 180-187, 204-209,

217-275. And because Plaintiffs' detentions and arrests – and the restrictions on

protected conduct leading up to them - occurred in the context of a First

Amendment assembly, the First Amendment issues at play in this case have

Fourth and Fourteenth Amendment liberty, Due Process, and Equal Protection

implications. *See, e.g., Schiller, et al. v. City of New York, et al.*, 04 Civ. 7922,

2008 WL 200021 at *2-5 (SDNY January 23, 2008) (RJS) (JCF); *MacNamara, et

al. v. City of New York*, 04 Civ. 9216, 275 F.R.D. 125, 154 (May 19, 2011)

(SDNY) (RJS) (JCF) (citing and discussing cases).[10]

---

[10]     For example, Due Process principles mandate that penal laws provide reasonable notice of prohibited conduct clearly and definitely enough that ordinary people can

The core of the First Amendment protects political speech, assembly, and other, similar expression, including group political speech and expression (such as demonstrations and related expressive association), *see, e.g., Jones v. Parmley*, 465 F.3d at 56 ("[t]he Supreme Court has declared that the First Amendment protects political demonstrations and protests-activities at the heart of what the Bill of Rights was designed to safeguard") (citing cases); *Roberts v. United States Jaycees*, 468 U.S. 609, 609 (1984), most heavily in traditional public fora such as streets and sidewalks, *Deegan v. City of Ithaca*, 444 F.3d 135, 141-142 (2nd Cir. 2006), from content-based and other unreasonable restrictions imposed by the government.

As a threshold matter, the FAC adequately pleads that Plaintiffs were engaged in protected activities leading up to their arrests, and that the NYPD targeted the perceived "group" of perceived OWS participants for mass arrest.

---

understand what they prohibit. Such laws must be clearly drawn to prevent arbitrary and discriminatory enforcement. Laws that do not as applied may be void for vagueness. They may also be attacked as overbroad if they cover a substantial amount of First Amendment protected conduct. *See, e.g., Kolender v. Lawson*, 461 U.S. 352, 357-358 (1982); *Buckley v. Valeo*, 424 U.S. 1, 76-82 (1976); *Broadrick v. Oklahoma*, 413 U.S. 601, 611-612 (1973); *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972); *Smith v. California*, 361 U.S. 147, 151 (1959).

Additionally, where as here, the arrest is initiated, or prolonged, impermissibly, including when those things happen as a result of a municipal policy, practice, or custom, the acts and omissions that cause those prolonged detentions can give rise to First Amendment-based claims, as well as Equal Protection- based claims. Thus, for example, even if a person's arrest for a summons-eligible violation – that is to say, a non-criminal offense - is privileged, if the person's detention is prolonged for impermissible purposes, such as delays caused "by 'ill will,' 'delay for delay's sake,' [or] officers' attempts to gather more evidence against [an arrestee…or] any other 'extraordinary circumstances,'" *Lebowitz v. City of New York*, 606 Fed.Appx. 17, 18 (2nd Cir. June 2 2015) (Summary Order) ("*Lebowitz II*") (internal citations omitted).

Among other things, Plaintiffs had the First Amendment rights to act as photojournalists. *See, e.g., Higginbotham*, 2015 WL 2212242, at *7-11; *see also von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2nd Cir. 1987) (citing N.Y. Civ. Rights Law Section 79-h(b).

In terms of the First Amendment-based retaliation claim, "the Court of Appeals has recently clarified that '[c]hilled speech is not the *sine qua non* of a First Amendment claim" - rather, a plaintiff may show "*either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm.'" *Pluma v. City of New York*, 2015 WL 1623828, at *7 (SDNY March 31, 2015), *quoting Dorsett v. County of Nassau,* 732 F.3d at 157, 160 (2nd Cir. 2013) (emphasis in original). Put simply, "[b]eing subjected to criminal charges is a cognizable concrete harm." *Higginbotham* at *11 (citing cases). Additionally, malice can be inferred from the lack of probable cause to arrest or prosecute, *see, e.g., Higginbotham*, 2015 WL 2212242, at *5, and both malice and causation as well as from other facts pleaded in the FAC, and reasonable inferences to be drawn therefrom.

Plaintiffs also challenge the regulations on their conduct, and the municipal policies and practices that injured them, on First Amendment grounds as lacking in content neutrality and failing to pass strict scrutiny[11], or alternately,

---

[11]    In this connection, Plaintiffs should be able to develop discovery to show that, as applied, the restrictions on their protected conduct and policies, practices, and customs complained of "were adopted by the government 'because of disagreement with the message [the speech] conveys,'" *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (June 18, 2015).

as lacking narrow tailoring,[12] and failing to provide ample alternatives for expression, as well as to the extent the Defendants seek to construe them as strict liability offenses. *See, e.g.,* FAC 185-186; *see also People v. Bezjak*, 11 Misc.3d 424, 434 (N.Y.City Crim.Ct.,2006), *aff'd,* 26 Misc.3d 130(A) (1st Dept., 2010), *cert den'd*, 15 N.Y.3d 747 (2010).

In this connection, given the protest context, the First Amendment considerations must calculate into this Court's determinations about probable cause as well as the relevant Fourth Amendment, Due Process, and Equal Protection considerations. For example, there is no such thing as "group" probable cause, especially in the protest context. *See, e.g, Dinler, et al. v. City of New York,* 04 Civ. 7921 (RJS) (JCF), 2012 WL 4513352, at *3-6 (SDNY Sept. 30, 2012)*.

Additionally, the United States Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder" and "the Supreme Court has long applied the 'clear and present danger' test to protest cases to determine when police interference is constitutional." *Jones v. Parmley*, 465 F.3d at 56-57; *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also, e.g.., People v. Epton*, 19 N.Y.2d 496 (1967) (reading the

---

[12]     "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, [Courts] must independently determine the rationality of the government's interest implicated and whether the restrictions are narrowly drawn *to further that interest.*"  *Olivieri v. Ward*, 801 F.2d 602, 606 (2nd Cir. 1986) (internal quotations omitted) (emphasis added).  A court "may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986).

"clear and present danger" standard into New York's prohibition on criminal anarchy); *People v Biltsed*, 574 N.Y.S.2d 272, 277 (N.Y. Crim. Ct, 1991) (importing "clear and present danger" standard into new York's unlawful assembly statute to cure "problems" with "its attendant potential to chill First Amendment activity").

Thus, even where police interference is authorized because there is actually significant disorder creating or threatening significant public ramifications a clear and present danger of significant disorder creating or threatening significant public ramifications, police must provide fair warning as a matter of law in the form of clearly audible dispersal orders and a meaningful opportunity to disperse.[13]

---

[13]    Making it clear that the observation of some disorderly members at a First Amendment assembly does not permit the arrest of perceived members or associates of the perceived "group" without first providing fair notice and an opportunity to disperse or otherwise conform their conduct in *Jones v. Parmley*, the Second Circuit held that the plaintiffs

> had an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law. ... Plaintiffs still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning…..To the extent there was no imminent harm, plaintiffs' version of facts does not give rise to circumstances that would have suggested police need not have given a dispersal order as a matter of law.

*Id.*, 465 F.3d at 60-61 (internal citations omitted); *see also, e.g., Dinler,* 2012 WL 4513352, at *6; *see also, e.g., Dellums v. Powell,* 566 F.2d 167, 181 n.31 (D.C.Cir.1977) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit' would be constitutionally permissible.

Moreover, the 'fair notice' required . . . is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making") (cited favorably in *Jones*, 465 F.3d at 60-61); *Barham v. Ramsey*, 434 F.3d 565, 576 (D.C. Cir. 2006) ("[Commanding officer] could not 'deal with the crowd as a unit' unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order.")

Against that backdrop, and as discussed further in connection with Plaintiffs'

*Monell* claims below, Plaintiffs' First Amendment, Fourth Amendment, and Fourteenth

Amendment-based claims are adequately pleaded.

## POINT VIII

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
IMMUNITY (RESPONDING TO PP. 8-9 AND IN PASSING
ELSEWHERE IN DEFENDANTS' MOL)**

As set forth above, there was no probable cause to arrest or prosecute Plaintiffs

for any offense. Beyond that, the FAC does not set forth facts that establish as a matter of

law that defendants had even arguable probable cause to arrest, prosecute, or otherwise

injure Plaintiffs.[14]

In this connection, Plaintiffs' rights to be free from false arrest, excessive

force, excessive detentions, malicious prosecutions, violations of their Sixth

Amendment rights, restrictions on their First Amendment rights imposed upon

them based on their perceived association with OWS, as well as their rights to

enjoy Due Process and Equal Protection under the laws, were all clearly

established at the time of Plaintiffs' arrests and prosecutions. Relatedly, Plaintiffs'

---

*Jones v. Parmley* also reiterates that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest. ... 'clear and present danger' means more than annoyance, inviting dispute or slowing traffic." 465 F.3d at 57-58 (internal citations omitted).

[14] "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia v. Does*, 779 F.3d 84, 92 (2nd Cir. 2015), *quoted in Higginbotham* at *4.

First Amendment and related rights as photojournalists was clearly established.
*See, e.g., Higginbotham,*, 2015 WL 2212242, at *7-11.

Moreover, "[a]n a motion to dismiss, ... a qualified immunity defense based on arguable probable cause ''faces a formidable hurdle...' and is usually not successful.'" *Higginbotham* at *4 (internal citations omitted); *see also Schiller,* 2008 WL 200021, at *5; *Tellier v. Fields*, 280 F.3d 69, 84 (2nd Cir. 2000) ("Because qualified immunity is an affirmative defense...the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time") (internal citation and quotation omitted); *Palmer v. Richards*, 364 F.3d 60, 67 (2nd Cir. 2004) (same).

Moreover, government officials who take official actions with malicious intent to cause deprivations of constitutional rights or injury, or who falsify evidence and engage in similar, related dishonest practices, cannot enjoy qualified immunity.[15]

Here, as discussed above, malice can be inferred from the lack of probable cause to arrest or prosecute, as well as from the falsification of police records, falsely sworn testimony, and false trial testimony described in the FAC. Particularly given the "high

---

[15]     *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (qualify immunity inappropriate if defendant official "knew or reasonably should have known" his official actions "would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury"); *Morse II,* at *1 ("the knowing creation of false or misleading evidence by an officer acting in an investigative capacity . . . qualifies as an unconstitutional deprivation of the victims' rights...[that] was, moreover, clearly established at the time of the defendants' conduct. The defendants are therefore not entitled to qualified immunity") and at *7 and *10; *see also Coggins,* 776 F.3d at 114 ("As the District Court properly concluded, the alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise"); *Riccuti,* 124 F.3d at 130 (no qualified immunity where plaintiffs alleged that defendants had intentionally fabricate evidence against them).

hurdle" at this stage of the litigation, dismissal of Plaintiffs' claims on qualified immunity grounds is not warranted on the face of the FAC.

**POINT IX**

**THE FAC ADEQUATELY PLEADS PLAINTIFFS' *MONELL* CLAIMS (RESPONDING TO PP. 20-25 OF DEFENDANTS' MOL)**

Relying on the facts set forth above as well as facts set forth in Paragraphs 217-275 of the FAC, Plaintiffs raise *Monell* claims predicated on NYPD policies, practices, and customs related to:

- The use of arrests in lieu of issuing summonses for summons-eligible offenses (FAC 221(f));

- The use of police resources to corral and trap perceived participants in First Amendment assemblies (FAC 221(g));

- Failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies (FAC 221(a));

- Treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes in the context of First Amendment assemblies without ensuring that lawfully authorized and constitutionally significant notice, and meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit" or arresting people for violations of purported police directions (FAC 221(c));

- Applying PL 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic) in circumstances where there is no lawful authority to arrest or detain perceived "groups" of people (FAC 221(d));

- Applying PL 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given (FAC 221(e));

- Assigning "arrest teams" of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to "process" the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information (FAC 221(h));

- Inserting NYPD Legal Bureau and Criminal Justice Bureau agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of (FAC 221(i);

- Utilizing inadequate use of force and use of force reporting-related policies, including failing adequately to discipline officers whose excessive uses of force and other constitutional violations complained of herein have been documented and captured in mainstream and social media, in litigation, and other contexts of which Defendants are aware (FAC 221(b), 246-252); and

- Failing to train, supervise, and discipline related to the above policies, practices, and customs (FAC 246-248, 253, 274).

Although these policies, practices, and customs were adopted and articulated against OWS and perceived association with OWS, *see, e.g.,* FAC 222(k), (m), and (n); 254-273, each of which are iterations of *Monell* theories pleaded and explored in prior litigation, the developments of which the FAC traces, in part, over a period of about ten years, including by referring to prior litigation raising similar *Monell* claims. *See, e.g.,* FAC 222(a) through (j); *see also, e.g.,* FAC 222(a), 223-226 (discussing *Mandal, et al. v. City of New York, et al.,* 02 Civ. 1234 (SDNY) (WHP)(FM)); 222(f), 227-240 (discussing the RNC cases), including *MacNamara, et al. v. City of New York, et al.*, 04 Civ. 9216 (SDNY) (RJC)(JCF), and the Second Amended Class Action Complaint in *MacNamara, et al. v. City of New York, et al.*, 04 Civ. 9216 (SDNY) (RJC)(JCF), Dkt. No. 200-2 (*see* Oliver Decl. Paragraph 18, Exh. A); *Callaghan, et al v. City of New York, et al.*, 07-CV-9611 (SDNY)(PKC)(JLC), and the *Callaghan* Third Amended Complaint at Paragraph 143 (*see* Oliver Decl. Paragraph 19, Exh. B); and 222(j), discussing *R.J. Osterhoudt v. City of New York, et al.*, NO. 10 CV 3173 (EDNY) (RJC)(RML) and the Second Amended Complaint (Oliver Decl., Exh. D). The pleadings in *MacNamara* and *Callaghan* – two cases which proceeded through the close of discovery before settling -

set forth facts supporting and articulate *Monell* claims nearly identical to those raised in this case. *See*, e.g., *Callaghan* Dkt. No. 14 (Oliver Decl. Exh. B) at Paragraph 143; Oliver Decl. Exh. C. As is reflected in the *Callaghan* docket, when the defendants sought leave to move to dismiss and/or to bifurcate discovery as to plaintiffs' *Monell* claims toward the end of discovery in *Callaghan*, the Court denied the application, determining that the *Monell c*laims were "in play." *See, e.g.,* Oliver Decl. Exh. C (*Callaghan* Dkt. N. 88-4, list of *Monell* claims the Court determined were "in play") *Callaghan* Dkts. Nos. 86-88, 95, 98 (related Fed.R.Civ.P. 72 briefing).

Although Defendants argue that the FAC is implausible or conspiratorial, and relies improperly on bare allegations rather than facts, to the contrary, the FAC adequately pleads a historical and factual relationship between the practices and customs that injured Plaintiffs and those described in the cases discussed in the FAC. *See, e.g., Osterhoudt,* 2012 WL 4481927, at *2, *citing Colon v. City of New York*, 2009 WL 4264462, at *2 (EDNY Nov. 25, 2009) ("denying motion to dismiss where plaintiff's allegation that officers manufactured drug evidence plus court's 'knowledge of cases in other federal and state courts' stated plausible *Monell* claim").

The Court denied defendants' bid to dismiss the *Osterhoudt* plaintiff's *Monell* claims, which Osterhoudt supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum" including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis . . . [that] Osterhoudt alleges . . .

caused his own arrest on November 5, 2008" and that "the NYPD failure to train officers how to determine individual probable cause, instead of sweeping up arrestees *en masse*, is the same failure that led to his own unlawful arrest," 2012 WL 4481927, at *1-2.

To the extent any such scrutiny might be necessary beyond the face of the FAC, a review of the pleadings cited to in the FAC, and the dockets and decisions in those cases, will reveal that, far from being new or conspiratorial theories of liability, the *Monell* claims advanced in the FAC are almost exclusively updated iterations of previously-made claims against a police department that refuses to change its policies and practices with respect to First Amendment assemblies.

Additionally, a municipality's failure to train police officers can give rise to *Monell* liability where the failures to train amount to deliberate indifference. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 388-389 (1989); *Ricciuitti*, 941 F.2d at 123. *See, e.g.,* FAC 246-248, 253, 274.

Finally in this connection, Defendant City faces liability based on *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), to the extent that Defendant Hall or the other Supervisory Defendants were policymakers.

Therefore, the FAC adequately sets forth Plaintiffs' *Monell* claims for pleading purposes sufficient to entitle Plaintiffs to discovery and the Court should deny Defendants' bid to dismiss them.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' application in its entirety.

DATED:       Queens, New York
               January 19, 2016

Gideon Orion Oliver
Attorney at Law
Attorney for Plaintiffs
277 Broadway, Suite 1501
New York, NY  10007
646-263-3495

cc:    All parties (by ECF)